Filed 4/15/13  Lyons v. Thermos CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| CHARLES J. LYONS, III, | B238812 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. VC053406) |
| v. | |
| ELIZABETH THERMOS, et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Patrick T. Meyers, Judge.  Affirmed.

Telep Law and Desiree Telep for Defendants and Appellants.

Buckner, Alani & Mirkovich, William D. Buckner, Catherine J. Weinberg and Andrew Y. Prochnow for Plaintiff and Respondent.

_____

In September 2000, Bellflower Business Partners, L.P. (BBP), a California limited partnership, leased commercial property (the Premises) in the City of Bellflower to defendant and appellant Urethane Products Corporation (UPC). Plaintiff and respondent Charles Lyons III (Lyons) executed the lease (Lease) on BBP's behalf as President and General Partner. In 2005, appellant Elizabeth Thermos (Thermos) executed a guaranty of UPC's Lease obligations. After UPC vacated the Premises in January 2009, Lyons filed a complaint against UPC and Thermos for breach of contract, breach of written guaranty, equitable indemnity and waste. Judgment was entered against UPC and Thermos (collectively referred to as appellants) and they appeal.

We affirm.

### FACTUAL & PROCEDURAL BACKGROUND

The initial term of the Lease was five years, from November 1, 2000 to October 31, 2005. The fixed minimum rent was $6,670 per month. Paragraph 7.4 of the Lease provided that upon expiration of the Lease term, the Premises must be surrendered "with all of the improvements, parts and surfaces thereof broom clean and free of debris, and in good operating order, condition and state of repair, ordinary wear and tear excepted." Gerald Thermos, a principal, officer and director of UPC at that time (Jerry), executed a guaranty of all the terms and obligations.

In a written amendment dated May 19, 2005 (the Amendment), the term of the Lease was extended to October 31, 2008.[1] The Amendment provided that the guaranty be modified so Thermos would be the guarantor and Jerry would be released of his liability as of November 1, 2005. Thermos signed the Amendment on behalf of UPC and also signed a separate guaranty, limiting her liability to a maximum of $50,000.

After the Lease ended and UPC vacated the Premises in January 2009, Lyons sought reimbursement for the amount he spent for cleaning and repair. On April 27, 2009, Lyons filed a lawsuit for breach of contract against UPC and Thermos. UPC and

---

[1] Lyons executed the Amendment as "Charles Lyons III, an individual."

Lyons answered and filed a cross-complaint. Lyons then filed a First Amended Complaint for breach of contract, breach of written guaranty, equitable indemnity and waste. The waste cause of action was subsequently dismissed, and the parties agreed to trial by court.

At trial, several witnesses testified about the condition of the Premises before and after UPC's occupancy.

*Lyons*

Lyons testified he built the Premises in 1995. It was an 11,000 square foot industrial building with a fenced yard and a heavy duty 5-inch thick reinforced floor. The floor was sealed with epoxy and all expansion joints were sealed to prevent penetration by liquid products because Lyons did not want any environmental liability.

Lyons owned 20 percent of BBP in 2000. Lyons authenticated his signature on the lease and testified that Jerry signed the lease on behalf of UPC in his office. The rent was $6,670 per month. Lyons also authenticated the renewal agreement and initially said that Thermos signed it in his office. He did not remember if Thermos signed the guaranty in his office, but testified that her signature was the same signature that appeared on the lease.

Lyons said when he saw the Premises in September 2008, he saw "everything in disrepair." He authenticated an email he sent in September 2008 (Exhibit No. 18C) to Chander Burgos of UPC in which he stated that the Premises would need about $100,000 in repairs. In a subsequent email to Burgos, he said a contractor told him the clean-up charges would be in the $50,000 to $60,000 range, and he would require the security deposit to be increased to $60,000 as a condition for renewal of the lease. He was not able to negotiate an increased security deposit.

UPC remained on the Premises until January 5th or 6th, 2009.[2] Lyons did not return the security deposit to UPC when it vacated. He said he provided UPC with

---

[2]    Although the Lease term ended in October 2008, UPC paid rent at a holdover rate.

itemizations of damages but then confirmed that he testified at his deposition that he never provided it any documents, bills or invoices.

*Jerry Thermos*

Jerry, the son of appellant Thermos, testified on behalf of Lyons. His father had founded UPC. He executed the Lease and authenticated his signature. He remembered signing a guaranty and knew he had been released from it.

UPC manufactured marine fenders and buoys which were made out of steel, urethane foam, polyethylene foam, polyurea and/or polyurethane coatings. He described the manufacturing process, which involved spraying polyurea through a spray gun onto the fenders. Many corrosive chemicals were used. UPC installed a spray booth on the premises to contain the overspray and obtained a permit to do so. When UPC moved into the Premises in 2000, they were "in very good shape" with a "brand-new epoxy floor." In 2004, there was no overspray on the floor and the asphalt floor did not resemble the floor depicted in the photographs in Exhibit 15 because there were stains and discoloration. He identified polyurethane overspray in the pictures in Exhibit 15.

Jerry testified he left the business in 2004 because of a family disagreement and currently works for a competitor. He had not been back to the Premises since then. On cross-examination he admitted he had pled guilty to a violation of the Sherman Anti Trust Act.

*Haitham Jammal*

Haitham Jammal, a general contractor, testified he visited the premises in September 2008 with Lyons' son. Jammal testified about the condition of the Premises, and was provided with a binder of photographs which he referred to in testifying.

In early November 2008, he went on another visit to the Premises, with the purpose of reviewing with UPC what needed to be fixed before it vacated. Lyons told UPC to replace the tile, subfloor and lights.

Jammal then walked through the Premises on January 7, 2009, after UPC had vacated. He saw spills and stains on the floor, corrosion on the asphalt and corroded light fixtures. Jammal and Lyons took pictures, which Jammal identified in Exhibit 15. He

4

identified in the photographs corrosion on the light fixtures, damaged foil, staining on the floor, improper wood repairs, water damages, poor workmanship , and a dirty spray booth. A "purlin hanger" was rusted and corroded beyond normal wear and tear. The HVAC venting was covered with lint, foam and chemicals. The vinyl composition tile flooring on the mezzanine was damaged. The warehouse flooring was painted over with the wrong type of paint, covering metal shavings and dirt. The ceiling tile was stained, the skylights were damaged, the roof was poorly patched, and the asphalt was deteriorated and discolored. In his opinion, the damage was beyond ordinary wear and tear.

Jammal had no personal knowledge about how the damage was done.

Jammal performed repair work in February 2009. He cleaned and replaced and painted sprinkler pipes and heads. He replaced 34 bulbs, repaired a "saddle," replaced foil, sandblasted the floor, replaced ceiling tiles, and the door.

He authenticated his invoice for the work, Exhibit 5, which showed the amount billed as $66,975.50.

Jammal testified he had worked with Lyons since 2002 at dozens of buildings. Although he characterized himself as a friend of Lyons, he also said "everybody is my friend."

*Jack Karp*

Jack Karp testified that he was an industrial real estate broker who had brought Jerry to the Premises and brokered the lease. He had testified as an expert witness in other cases, and had given lectures to professional associations of brokers, and was a member of several professional real estate associations. He had been a friend of Lyons for 30 years. He testified "Everything in the premises, including the roll-up door, were in top shape, brand-new" at the inception of the lease. He also described the asphalt as "pristine" and "in perfect condition."

Karp continued to testify about the condition of the Premises but UPC's attorney objected on the grounds that he had not been designated as an expert witness and to the range of his expertise. Karp admitted he did not have a formal education in construction,

5

and he was not a chemical engineer nor a general contractor. He had no personal knowledge of the Premises being constructed. However, he was a technical advisor to the Los Angeles County Fire Department and has some familiarity with fire sprinklers.

When he saw the Premises in January 2009, the floor was in poor condition and "was painted with the wrong type of paint and was unacceptable in industrial standards in Southern California." The skylights were damaged, and the asphalt was pitted and gouged and in relatively poor condition. Bolts were protruding through the floor, and it was pitted full of holes. Metal supports were corroded, skylights were not working, fire sprinklers were compromised, and stairwell treads were damaged, creating a hazardous condition. In his opinion, the Premises were not left in good condition.

*Chander Burgos*

Chander Burgos was the Vice President of UPC and the manager of manufacturing. He was hired in 2004. He described the manufacturing process, the chemicals used, and the use of the spray booth to apply the chemicals. He described making a foam and shaping it as a buoy or fender, and then spraying it with polyurea, using a spray gun. Spraying also took place in the side yard of the Premises as well. UPC did not have a building permit for the spray booth.

Burgos managed the move-out and inspected the Premises. He delegated the repair work to a contractor, Salvador Padilla, but he inspected it. He was "partially" there when the floor was sanded.

Approximately 12 employees worked on the Premises prior to vacating. Burgos testified that they removed the spray booth, re-did the floor, painted walls, re-coated floors, replaced tile fixed railing, and put in new carpet. He denied painting over dirt-coated floors. He took the pictures in Exhibit 16, probably a week before New Year's Day 2009. He said that upon vacating, the Premises were in "excellent" condition, "really nice" and free of debris. They did not leave the Premises in the condition depicted in the pictures in Exhibit 15.

Burgos had discussed the additional security deposit discussed with Lyons in e-mails beginning around September 2008. He said Lyons wanted the Premises in "luxury

6

condition." After the repairs, Lyons came for a walk-through and told Burgos he was surprised at how much work they had done.

*Salvador Padilla*

Salvador Padilla testified he was a general contractor who performed repair work on the Premises for UPC beginning in October 2008 for three and one-half months. Lyons told him to take out electrical wiring. He removed offices in the mezzanine and painted inside the warehouse. He scraped floors, repaired floor tiles, painted bathrooms, and replaced foil. He removed the "cage area," plumbing and ductwork. He did not inspect pipes or sprinklers. He did not replace lights because he would have needed a permit to do so. He observed that the existing lights were not made anymore. There were no problems with holes in the floor. The asphalt only needed a coating so they did not replace it. He painted over the tile because it was so damaged. He said he used whatever paint was on the specifications given to him.

Padilla testified he was a mechanical engineer but that he was no longer licensed as a contractor.

He admitted to running out of time in mid-December. He had night laborers come in to work on December 20th.

He talked to Chander Burgos about the stairs. They did not replace them because they ran out of time. Burgos did not supervise the work but was present in the office.

At a walk-through, Lyons only seemed to be upset about the color of the carpet.

Padilla recognized and authenticated a copy of his invoices to UPC for $4,000, $3,978.56 and $6,000 respectively.

*Dean Van Doren*

Dean Van Doren testified that he currently leased property to UPC. Prior to entering into that lease, he went to the Premises in November 2008 to see if it was in good condition. After viewing the Premises, he decided that UPC would be a good tenant.

7

*Statement of Decision*

On November 7, 2011, the trial court filed a 52-page Statement of Decision which summarized all the testimony, exhibits and applicable law. The court stated, inter alia, "The quality of Lyons' evidence has more convincing force than the quality of the evidence mounted by UPC against it. [¶] Lyons has proved more likely to be true than not true that UPC breached the covenant set forth in . . . the lease agreement. Lyons also carried such burden of proof as to his second cause of action against Thermos for Liability under her written guaranty of lease. Although his first cause of action for breach of written contract purports to include Thermos thereunder, she was not a contracting party to the lease agreement between UPC and Lyons. . . . Although she is entitled to judgment in her favor under the first cause of action, her liability under the second cause of action makes her subject to a recovery by Lyons of up to $50,000 as a guarantor to the maximum extent of $50,000 in the event UPC fails to satisfy Lyons' judgment against it."

The trial court adjusted the cost of repairs to exclude portions billed for new light fixtures and insulation foil costs. It added one month's rent to that amount, deducted the cost of the initial security deposit less interest.

Judgment was entered on December 2, 2011, in favor of Lyons and against UPC on the breach of contract action for $57,624.10, and against Elizabeth Thermos on the breach of guaranty cause of action in an amount not to exceed $50,000 in the event UPC failed to pay damages due under the breach of contract cause of action. UPC and Thermos recovered nothing on the cross-complaint.

On appeal, UPC and Thermos contend that the trial court's ruling was biased, there was insufficient evidence to support the judgment, the court erred in admitting testimony from Jerry and Jack Karp, and that the court erred in entering judgment against UPC and Lyons on their cross-complaint.

8

## DISCUSSION

### 1. Sufficiency of the evidence to support the judgment

We note at the outset that appellants did not include in their appendix a copy of the judgment or the notice of appeal, as required by the California Rules of Court, rule 8.122 and 8.124. Lyons did provide a copy of these documents in his Respondent's Appendix.

Appellants contend UPC was not required to renovate the Premises as a condition of the Lease, and that they presented evidence that UPC surrendered the Premises as required by the Lease.

Appellants also contend that Lyons' photographs (Exhibit 15) identify damage that Lyons caused, not appellants. In addition, they contend that the court abused its discretion in relying on Jerry's testimony because he was a convicted felon and a biased witness.

When a party contends there is insufficient evidence to support a judgment, we apply the substantial evidence standard of review. (*Leslie v. Garvin* (1984) 37 Cal.3d 186, 201; *Lenk v. Total Western Inc.* (2001) 89 Cal.App.4th 959, 968.) We view the evidence "in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor. . . ." (*Jessup Farms v. Baldwin* (1983) 33 Cal.3d 639, 660.)

We agree that a covenant in a lease requiring a tenant to leave the premises in good order does not obligate a tenant to restore the premises in a better condition than they were at the inception of the tenancy. (*ASP v. Fard, Inc.* (2005) 133 Cal.App.4th 1257, 1272.) However, here there was substantial evidence to support the trial court's findings that the Premises were in excellent condition at the inception of the Lease, that damage beyond normal wear and tear was caused by the corrosive chemicals used in UPC's operations and that UPC's efforts to clean and repair the damage were insufficient.

While appellants point to evidence and possible inferences therefrom which would support their claim that their witnesses' testimony should have been accepted by the trial court, it certainly cannot be said that there was no substantial evidence to support the trial

9

court's finding in Lyons' favor. (*Gray v. Don Miller & Assoc.* (1984) 35 Cal.3d 498, 503.)

Lyons presented evidence about the condition of the Premises before UPC moved in and after it moved out. Jammal and Lyons identified the damage in photographs taken at or near the time UPC vacated. Lyons and Jammal presented detailed testimony about the repairs and how much they cost.

The trial court found Lyons' witnesses and evidence credible. Appellants' contentions are nothing more than a request that we reweigh the evidence. That is not our role on appeal. (*Scott v. Pacific Gas* (1995) 11 Cal.4th 454, 465.)

2. *Testimony of Jack Karp*

Appellants also contend the court erred in relying on Jack Karp's testimony since he was not qualified as an expert and was biased because he was a longtime personal friend of Lyons.

During direct examination of Karp, appellants' counsel objected to his testimony about the condition of the sprinklers, stating she was not informed that Karp would be called as an expert. She was allowed to question him on voir dire. During that examination, he stated he was an industrial real estate broker with no formal instruction in construction and he was not claiming he was an expert in construction. Appellants' counsel sought to exclude his testimony as to the condition of the construction. The court stated, "I am just not accepting of your notion that someone who is a real estate broker of long standing and has had some involvement in the industry to the point of being involved, which has not been undermined in the formulation of a commercial lease doesn't have experience in assessing and evaluating conditions of properties and what might be needed to be done to a property to make it marketable or what need not be done to a property because of its present condition to make it marketable. I just don't see that someone has to be a general contractor to be able to do those things."

Appellants contend that Karp did not sufficiently establish his expertise, and even if he did, that his testimony exceeded his expertise, and finally that he was biased because he was Lyons' friend.

10

"'A trial court's determination that expert testimony is admissible is reviewed for an abuse of discretion.' [Citation.]" (*Burton v. Sanner* (2012) 207 Cal.App.4th 12, 18.) "'Generally, the opinion of an expert is admissible when it is "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact."'" (*Id.* at p. 19.) Expert testimony should not be admitted when the subject is one of such common knowledge that persons of ordinary education could reach a conclusion as intelligently as the witness. (*Ibid.*)

Karp's testimony consisted mainly of observations about what he observed at the Premises. His description of the condition before UPC occupied the Premises was in general, non-technical terms, such as "pristine" and "brand new." His description of the premises after UPC left was also in ordinary every day terms, such as a description of bolts protruding from the floor and pitted and gouged asphalt. His experience in brokering commercial leases would have qualified him to testify that the Premises were not in good condition. He also remarked that the stairwell treads were in a dangerous condition and that the floor was painted with the wrong type of paint and the sprinklers were compromised. He later explained that he was a technical advisor to the County fire department. The remarks about the stairs and floor paint were of the type that required an engineer's or contractor's expertise. However, his testimony on these conditions was superfluous to that of Jammal, a licensed contractor, so the court had a sufficient basis upon which to support its findings.

As for his bias, Karp's relationship with Lyons was brought out and duly noted by the trial court in its Statement of Decision. Karp testified that he would neither lie nor alter his testimony for Lyons. The trial court, as trier of fact, was entitled to find him credible.

3. *Validity of Lease Agreement*

Appellants contend that the court erred in admitting the Lease since more than one copy was submitted to the court and the signatures of Thermos on the two documents did not conform. We presume they are referring to the Amendment since Thermos did not

11

sign the original Lease. The only witnesses who authenticated her signature were Jerry and Lyons, but not Thermos.

Prior to trial, appellants' counsel raised the issue of different dates and signatures on different copies of the Amendment. Both of the copies were sent by Lyons' counsel and marked as two different exhibits. The court took the matter under submission. After the close of Lyons' case, appellants raised the issue of the two different versions of the Amendment in a motion for judgment under Code of Civil Procedure section 631.8. The court denied the motion, stating, "There is not a scintilla of evidence that there is another lease as far as this court is concerned . . ." but reserved ruling on the motion. At the close of evidence, it denied the motion without prejudice to consideration in the course of preparing the Statement of Decision.

Jerry testified that he signed the Lease. A letter to Jerry from Lyons enclosed three copies of the Lease and asked him to return two copies of the signed and initialed Lease. Appellants did not establish by any factual evidence that Thermos did not sign the Amendment. She did not testify at trial, and Lyons testified he saw her sign the Amendment or the guaranty. The court stated in its Statement of Decision, "[e]ven given minor variations in such handwritten insertions . . . in copies of the initial lease, there appears little, if any, to no doubt that copies of such lease were executed by [Lyons] and by [Jerry] . . . . No variations of even a minor nature were meaningfully reflected in the printed terms of [the] agreements . . . ."

Appellants did not present any evidence which established that the Lease, Amendment or guaranties were forged, inauthentic, or that the terms of the documents were altered. There was no error in admitting the exhibits.

*4. Judgment on Cross-complaint*

Appellants contend that Lyons violated Civil Code section 1950.7 since he admitted he did not return UPC's security deposit, did not properly notify it of any transfer of the deposit, and did not prove that any of the repairs were reasonably necessary or caused by UPC.

12

The contention regarding the necessity and reasonableness of the repairs has been addressed *ante*.

Section 1950.7 of the Civil Code provides, in pertinent part: "(c) The landlord may claim of the payment or deposit only those amounts as are reasonably necessary to remedy tenant defaults in the payment of rent, to repair damages to the premises caused by the tenant, or to clean the premises upon termination of the tenancy, if the payment or deposit is made for any or all of those specific purposes. . . . [¶] (3) If the claim of the landlord upon the payment or deposit includes amounts reasonably necessary to repair damages to the premises caused by the tenant or to clean the premises, then any remaining portion of the payment or deposit shall be returned to the tenant at a time as may be mutually agreed upon by landlord and tenant, but in no event later than 30 days from the date the landlord receives possession of the premises. [¶] (d) Upon termination of the landlord's interest in the unit in question, whether by sale, assignment, death, appointment of receiver or otherwise, the landlord or the landlord's agent shall, within a reasonable time, do one of the following acts, either of which shall relieve the landlord of further liability with respect to the payment or deposit: [¶] (1) Transfer the portion of the payment or deposit remaining after any lawful deductions made under subdivision (c) to the landlord's successor in interest, and thereafter notify the tenant . . . of the transfer . . . . [¶] (2) Return the portion of the payment or deposit remaining after any lawful deductions made under subdivision (c) to the tenant.

According to Lyons' testimony, BBP sold the property in 2002 to Stockton Lyons. The security deposit was transferred to them. Stockton Lyons in turn sold a 42 percent interest in the property to Adams Partners #2, and a 42 percent of the security deposit was transferred to it. Stockton Lyons sold the remaining 58 percent of the property to Lyons' parents in 2003. In 2004, Adams Partners #2 sold its 42 percent interest to Lyons and his wife and transferred its share of the security deposit. Lyons' parents gifted their 58 percent in the property to Lyons and his wife and transferred their share of the security deposit. At the time of the trial, Lyons owned 29 percent percent of the property as his

sole and separate property and 71 percent was owned by him and his wife as community property.

This testimony establishes that although a portion of the security deposit was transferred, it was ultimately returned to Lyons, who held the Premises with his wife by the time UPC vacated. Therefore, any failure to notify UPC of the various transfers prior to that time would be utterly harmless. In any event, since we have found there was no necessity to return the deposit, appellants cannot show any prejudice.

*5. Judicial Bias*

Appellants contend that the court's statements, in conjunction with the statement of decision, demonstrate that the court was "guilty" of prejudicial misconduct and judicial bias. In particular, they refer to the court's remarks at trial and in the Statement of Decision about appellants' prior counsel, Mr. Blaskey.[3] The record reveals that the court told trial counsel, "I suppose I am venting my spleen more than anything else[,] . . . but I reviewed at great length the course of this trial before you became involved, . . . . [¶] [b]ut if any case stands for nominating Mr. Blaskey as a poster boy for the repeal of C.C.P. Section 473 . . . which permits defaults to be set aside purely on the basis of the kind of declaration that he filed in this case, . . . . [¶] This is a sorry record in that regard. I realize that were not in, but . . . the whole course of this case has been a real lesson for this court. . . ." Appellants then refer to portions of the Statement of Decision which sets forth the procedural history of the case, and documents the actions of Mr. Blaskey.

We find nothing in the court's remarks and references in the Statement of Decision which relate to judicial bias against appellants and UPC. The comments and references clearly indicate the court was criticizing UPC's former counsel and not current counsel or UPC.

---

[3] Appellants were represented by Mr. Blaskey up until December 2010.

14

*DISPOSITION*

The judgment is affirmed.  Lyons shall recover costs on appeal.

**WOODS, J.**

**We concur:**

**PERLUSS, P. J.**                              **JACKSON, J.**