[No. D057579. Fourth Dist., Div. One. June 21, 2012.]

JOSEPH BURTON et al., Plaintiffs and Appellants, v.
GARY SANNER, Defendant and Appellant.

14

COUNSEL

Law Offices of Robert G. Dyer and Robert G. Dyer for Plaintiffs and Appellants.

Konoske Akiyama & Brust, Gregory P. Konoske, D. Amy Akiyama and Megan K. Hawkins for Defendant and Appellant.

OPINION

**McCONNELL, P. J.**—This negligence action, for personal injury and wrongful death, arises from shootings by Gary Sanner during an intrusion at his home. The principal question on appeal is whether the trial court prejudicially abused its discretion by admitting the opinions of plaintiffs' designated expert, a retired police officer, on the reasonableness of Sanner's conduct. We answer the question in the affirmative and reverse the judgment. The test of reasonableness is an objective one for the jury when, as here, it is just as competent as the expert to evaluate the evidence and draw conclusions. The expert testimony usurped the jury's role.

### FACTUAL AND PROCEDURAL BACKGROUND

Sanner and Jennifer Sanchez married in 2001. She has a son, Shayne Thompson (Shayne), who lived with Sanner and Sanchez in Sanner's small

house in rural Descanso. Numerous times, Shayne climbed through a back window to get into the house when he did not have his key. Sanchez and Shayne moved out of the house in October 2007, and in April 2008[1] she filed for dissolution of the marriage.

On August 8, a Friday, Sanchez placed several calls to Sanner about retrieving the title to Shayne's truck, which was at Sanner's house. That afternoon and into the evening, Sanchez and her boyfriend, Joseph Burton, drank beer together at her house. She drank at least four beers and he drank at least eight beers. A friend of Sanchez's who stopped by late that evening described Burton as "intoxicated" and Sanchez as "under the influence."

Sanchez phoned Sanner between 11:00 and 11:30 p.m. Sanner had drunk at least six beers that evening and he had gone to bed. The phone call awakened him, but he did not answer. Sanchez left a message that she planned to go to his home to retrieve belongings she had left there.[2] Sanchez felt Sanner was being uncooperative. He had been paying for her cell phone service, but he had discontinued the service that day without warning.

Sanchez and Burton decided to go to Sanner's home. About midnight, Burton phoned the sheriff's department for an escort because he feared trouble. The department advised him it had no escort available at that hour, and he should call back during business hours. Sanchez and Burton, however, were unwilling to wait. Sanchez again called Sanner about 1:00 a.m. on August 9, and he did not answer. The call awakened Sanner. His landline had caller identification, and he could see the call came from Burton's cell phone.

Burton's daughter, Jessica Burton (Jessica), was visiting Burton and Sanchez at Sanchez's house. Shayne, then age 16, and Burton's son, Joseph Eric Burton (J.E.), then age 18, were friends, and they were together at Burton's house. Burton and Sanchez decided the boys should join them at Sanner's house to help retrieve her belongings. J.E. and Shayne drove to Sanner's house in J.E.'s truck, and Jessica drove Burton and Sanchez there in Burton's truck. Both trucks backed into and parked in Sanner's driveway at approximately 2:00 a.m. on August 9. It was a dark night, and there were no nearby streetlights or lights on inside or outside Sanner's house. His truck was parked at the house.

Sanner was awakened by his dog barking and the sound of a vehicle engine. He looked out the front window and saw two trucks backing into his driveway. Sanner thought one of the trucks belonged to Burton and the other

---

[1] Further dates are also in 2008.

[2] According to Sanner, Sanchez left this message about 8:30 p.m., and he did not return the call because she sounded intoxicated.

belonged to a male friend of Sanchez. Sanner dialed 911 from the back corner of his bedroom as he loaded his shotgun. He told the 911 operator, "There's two trucks pulled in my yard, and there are three men and they intend to do me harm. I need help immediately." He also told the operator, "I have a loaded shotgun, and I'm not letting them harm me." When the operator asked Sanner why he feared the men, he responded, "Because one of them is my estranged wife's boyfriend, and she thinks I've got something of hers that she wants." Sanner also said, "They're all intoxicated, and I will start shooting."

The group of five climbed onto the front porch of Sanner's house. Sanner, who was still on the 911 call, could see their silhouettes through the window. According to Sanchez, a motion light over the door activated, and she knocked on the door and loudly announced herself. According to Sanner, he had unscrewed the lightbulb before he went to bed because animals were continually activating it. A neighbor of Sanner explained he had asked Sanner to deactivate the motion light on occasion because it shone into the neighbor's guestroom.

Sanner heard knocking on the door, and he told the 911 operator he thought he heard Sanchez's voice. Sanner "was begging the police to get there." Sanner kept his interior lights off and said nothing because "I was not giving my position away."

When Sanner did not answer the door, Sanchez looked through the front window with a flashlight, but she could not see him. Sanchez directed Shayne to go to the back of the house to look for or call out to Sanner. Shayne left for the back and J.E. followed him.

Sanner saw the silhouettes of two persons outside his back window, and he mistakenly believed there were seven intruders in all. Shayne took the screen off the window, set it on the ground, and opened the window to try to "make contact" with Sanner. Shayne did not knock or announce himself. It was "pitch black" inside the home and Shayne could not see Sanner. Without any warning, Sanner fired his shotgun through the open window, mortally wounding J.E.

Still on the front porch, Sanchez heard the gunshot. She banged on the front window, and said, "Gary, no; Gary, stop." Sanner heard yelling from the front porch. He saw two silhouettes on the front porch and heard someone say, "Break the window." From the doorway of his bedroom, he fired a second shot through the front window. The shot hit Sanchez and seriously injured her.

There was no cell phone reception at the property, and Jessica drove Sanchez away to seek help. After verifying that J.E. was dead, Burton and

Shayne also left. As they prepared to leave, Shayne heard Sanner "asking who we were and telling us to get off of his property." Shayne responded, "It's Shayne. Don't shoot. It's Shayne," and "We just came to get our stuff." Sanner fired another shot through the front window that lodged in a tree. He fired the shot because "I just wanted help," and "I wanted everybody in Descanso calling 911."

Sanner said he feared for his life during the entire incident. Different scenarios occurred to him, such as a "home invasion," or that Sanchez was so angry that he had discontinued her cell phone service that "they were going to beat me up and teach me a lesson." When his back window was opened, he was terrified and believed "[t]hey're coming in."

Sanner's neighbor heard the gunshots and called 911. The neighbor saw a deputy go onto Sanner's front porch, and the motion light did not activate.

Sanchez and Burton sued Sanner for personal injury and wrongful death, respectively. The first amended complaint includes causes of action for negligence and battery. At the commencement of trial, Sanner moved in limine for an order excluding the testimony of plaintiffs' designated expert witness, a retired police officer, on Sanner's affirmative defense of necessity, or self-defense. Sanner argued the reasonableness of his conduct was an objective matter exclusively for the jury. The court denied the motion, and the expert testified that in his opinion Sanner's conduct was unreasonable. During the expert's testimony, Sanner objected many times to no avail.

Before the case was submitted to the jury, plaintiffs dismissed their battery claims. Sanner asked the court to instruct the jury to disregard the expert's testimony on the ground self-defense went to the battery claims. Plaintiffs countered that the expert testimony on Sanner's reasonableness was applicable to the negligence claim as well as the battery claims. The court refused to give a limiting instruction, stating, "there will be no instruction on self-defense, so there is no concern about there being confusion on the part of the jury as to [the expert's] testimony." The court, however, went on to instruct the jury on self-defense on the ground Sanner was arguing self-defense on the negligence claim.

In a special verdict, the jury found Sanner negligent, and that the negligence was a substantial factor in causing plaintiffs' harm. The jury assigned 75 percent of the responsibility for J.E.'s death to Sanner, and 25 percent to "[o]ther persons." It awarded Burton $6,000 in economic damages and $1.35 million in noneconomic damages. The jury found Sanchez was negligent, but her negligence was not a substantial factor in causing her harm. It awarded her $132,000 in past and future economic damages, and $140,000 in past and

future noneconomic damages. The court later reduced Sanchez's recovery for economic damages by $68,600.06 based on the amount of her medical bills.

DISCUSSION

I

*Inadmissibility of Expert Testimony*

A

Sanner contends the court erred by instructing the jury on self-defense, and by admitting Scott Reitz's expert testimony. Because we find error on the second issue, we need not address the first issue. Even if the instructions were proper, reversal is required.

"A trial court's determination that expert testimony is admissible is reviewed for an abuse of discretion." (*Summers v. A. L. Gilbert Co.* (1999) 69 Cal.App.4th 1155, 1168 [82 Cal.Rptr.2d 162] (*Summers*).) "Although a trial court has a great deal of discretion when it comes to admitting expert testimony, 'this discretion is not absolute.' " (*Id.* at p. 1169.) " 'Discretion is abused whenever, in its exercise, the court exceeds the bounds of reason, all of the circumstances before it being considered.' " (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 566 [86 Cal.Rptr. 65, 468 P.2d 193].) Despite the onerous test, we find abuse of discretion.

As to the affirmative defense of necessity, or self-defense, the California Supreme Court has explained: "[A]cts that are intended or likely to cause serious injury are not categorically wrongful in character and do not inevitably result in liability. For instance, a person is privileged to use '[a]ny necessary force' to protect or defend oneself or one's property from 'wrongful injury.' [Citations.] The right to use force against another has long been limited by the condition that the force be no more than ' "that which reasonably appears necessary, in view of all the circumstances of the case, to prevent the impending injury." ' [Citations.] When the amount of force used is justifiable under the circumstances, it is not willful and the actor may escape liability for intentionally injurious conduct that is otherwise actionable. [Citation.] But if force is applied in excess of that which is justified, the actor remains subject to liability for the damages resulting from the excessive use of force." (*Calvillo-Silva v. Home Grocery* (1998) 19 Cal.4th 714, 730–731 [80 Cal.Rptr.2d 506, 968 P.2d 65] (*Calvillo-Silva*), disapproved on another ground in *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 853, fn. 19 [107 Cal.Rptr.2d 841, 24 P.3d 493]; see Civ. Code, § 50.)

"Generally, the opinion of an expert is admissible when it is '[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact . . . .' [Citations.] Also, '[t]estimony in the form of an opinion that is otherwise admissible is not objectionable because it embraces the ultimate issue to be decided by the trier of fact.' [Citation.] However, ' "Where the jury is just as competent as the expert to consider and weigh the evidence and draw the necessary conclusions, then the need for expert testimony evaporates." ' " (*PM Group, Inc. v. Stewart* (2007) 154 Cal.App.4th 55, 63 [64 Cal.Rptr.3d 227]; see Evid. Code, § 801, subd. (a).) Expert testimony will be excluded " ' "when it would add nothing at all to the jury's common fund of information, i.e., when 'the subject of inquiry is one of such common knowledge that men of ordinary education could reach a conclusion as intelligently as the witness.' " ' " (*Summers, supra*, 69 Cal.App.4th at p. 1169.)

Scott Reitz is a retired police officer who worked for the Los Angeles Police Department (LAPD) for more than 29 years. For 15 years he was LAPD's primary "firearms instructor." He has trained more than 100,000 police officers and military troops in "marksmanship and technique in handling weapons," and in "deadly force." Several hundred police officers he trained later used deadly force on the job, and he used deadly force himself several times. During the previous 21 to 22 years, Reitz also trained up to 10,000 civilians in "firearm use and firearm safety and the use of deadly force."

As to the instant case, Reitz reviewed the audiotape from the 911 call, the preliminary incident and coroner's reports, photographs, and the deposition transcripts of Sanner, Sanchez, Burton, Jessica and Shayne. Reitz also visited Sanner's property. Reitz testified that in his opinion, Sanner's conduct "was not a reasonable response." Reitz faulted Sanner for not exhausting all alternatives to the use of force. Reitz claimed Sanner should have answered the phone call Sanchez made to him at approximately 1:00 a.m. on August 9. Reitz testified Sanner could have "simply responded and instructed [Sanchez] and the other individuals not to come over. That would have been one use of force option, as simple as that may seem." Reitz also said Sanner should have yelled to make his presence in the house known, warned the intruders he was on the phone with a 911 operator, ordered them off of his property, or fired a warning shot into the ceiling or air. Reitz also testified his opinion was not affected by any of the factors in Sanner's favor, such as the time of morning the incident occurred, the possible deactivation of his front porch motion light, and the opening of his back window.

Additionally, Reitz opined that given Sanner's training and experience as a psychiatric technician, he had no reasonable basis for fearing for his life.

Reitz testified: "Mr. Sanner . . . teaches crisis management. He teaches deescalation. And if one professes to teach something, one should be able to apply it. If something can be applied to an individual who is schizophrenic or suffering from dementia, most certainly those same principles would apply in a *normal setting* with people that are absent of these maladies." (Italics added.)

■ Under well-established law, Reitz's opinion testimony was inadmissible because it usurped the jury's role. The court gave the jury a modified version of CACI No. 1304, as follows: "Defendant claims that he is not responsible for plaintiffs' harm because he was acting in self-defense. To succeed, defendant must prove both of the following: [¶] No. 1, that defendant *reasonably believed* that plaintiffs were going to harm him, [¶] and No. 2, that defendant used only the amount of force that was *reasonably necessary* to protect him." (Italics added.) The court also gave the following special instruction: "The use of deadly force against an alleged intruder is not justified by the law unless the intruder was *reasonably believed* to have threatened death or serious bodily injury to the defendant." (Italics added.)

■ The reasonableness standard is an objective standard. (*People v. Jefferson* (2004) 119 Cal.App.4th 508, 518 [14 Cal.Rptr.3d 473].) Only relevant evidence is admissible (Evid. Code, § 350), and "[e]xpert testimony is . . . not relevant until the defendant puts at issue conduct or circumstances the jury might not otherwise understand as the basis for self-defense . . . ." (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1098 [56 Cal.Rptr.2d 142, 921 P.2d 1].) "When an alleged act of self-defense . . . is at issue, the question of what force was reasonable and justified is *peculiarly one for determination by the trier of fact.*" (*Calvillo-Silva, supra,* 19 Cal.4th at p. 731, italics added; see *People v. Bobo* (1960) 184 Cal.App.2d 285, 289 [7 Cal.Rptr. 466] ["Whether defendant, as a reasonable man, was justified in believing under all of the circumstances that he was threatened with imminent danger as to justify the use of a deadly weapon in self-defense was a question of fact for the jury."]; *People v. Schindler* (1980) 114 Cal.App.3d 178, 191 [170 Cal.Rptr. 461] [same];· *People v. Germany* (1974) 42 Cal.App.3d 414, 421 [116 Cal.Rptr. 841] [same].)

■ Sanner did not raise any circumstance the jury might not have understood in conjunction with his necessity defense. Reitz's testimony inappropriately drew legal conclusions concerning the objective reasonableness of Sanner's conduct. (See *Martinez v. County of Los Angeles* (1996) 47 Cal.App.4th 334, 348 [54 Cal.Rptr.2d 772].) Indeed, Reitz conceded, "We look at the facts. We look at all the data, and we *adjudicate and render decisions* based on all the information that we've investigated." (Italics added.) "[W]hen an expert's opinion amounts to nothing more than an

expression of his or her belief on how a case should be decided, it does not *aid* the jurors, it *supplants* them." (*Summers, supra,* 69 Cal.App.4th at p. 1183.)[3]

## B

Plaintiffs contend that experts on the use of deadly force are commonly used in cases such as this case. The opinions plaintiffs cite, however, all pertain to shootings by police officers who are trained in particular techniques and standards the jury may not understand without expert assistance.

For instance, in *Brown v. Ransweiler* (2009) 171 Cal.App.4th 516 [89 Cal.Rptr.3d 801] (*Brown*), an innocent bystander sued for negligence and assault and battery after she was injured by fragments from a stray bullet fired by a police officer attempting to apprehend a murder suspect. (*Id.* at pp. 520, 523.) This court affirmed a summary judgment for the defendants after concluding the officer's shooting was reasonable as a matter of law. (*Id.* at pp. 520, 525.) We explained: "An officer ' "may use reasonable force to make an arrest, prevent escape or overcome resistance, and need not desist in the face of resistance." ' [Citation.] ' "Unlike private citizens, police officers act under color of law to protect the public interest. They are charged with acting affirmatively and using force as part of their duties, because 'the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.' [Citation.]" ' [Citation.] ' "[Police officers] are, in short, not similarly situated to the ordinary battery defendant and need not be treated the same. In these cases, then, '. . . the defendant police officer is in the exercise of the privilege of protecting the public peace and order [and] he is entitled to the even greater use of force than might be in the same circumstances required for self-defense.' " ' " (*Id.* at p. 527.) The test of whether the officer was objectively reasonable under all the circumstances is " ' "highly deferential to the police officer's need to protect himself and others." ' " (*Ibid.*)

In *Brown*, the plaintiff contended she raised triable issues of material fact through an expert's declaration that the police officer used excessive force and his conduct was unreasonable. (*Brown, supra,* 171 Cal.App.4th at pp. 529,

---

[3] Plaintiffs assert the reasonableness of Sanner's conduct was beyond the "common experience" of the jurors because they had never had "to use deadly force to protect themselves or their loved ones." Jurors, however, routinely decide cases with scenarios they have never experienced. Indeed, parties frequently exclude potential jurors whose experiences mirror those at issue for fear of bias. The jury had a common fund of knowledge, through life experiences, to assist it in evaluating the evidence and reaching conclusions on its own. As discussed *post*, Reitz's testimony was irrelevant because it pertained to his training of police officers and civilians in the use of firearms and deadly force, when Sanner had no such training.

530.) The expert was a retired officer with 27 years of police experience. We concluded the declaration raised no triable issues of material fact because, among other infirmities, it included no reasoned explanation of how the expert reached his conclusion on the ultimate issue in dispute. We also criticized the declaration as based on conjecture, since the expert was not present when the shooting occurred. (*Id.* at p. 530.)

*Brown* has nothing to do with the propriety of expert opinions on a civilian's use of self-defense. The following opinions, which plaintiffs also cite, are inapposite for the same reason. (*Munoz v. City of Union City* (2004) 120 Cal.App.4th 1077, 1091 [16 Cal.Rptr.3d 521] [expert testimony presented on deadly force in civil suit against police officer]; *Calatayud v. State of California* (1998) 18 Cal.4th 1057, 1071 [77 Cal.Rptr.2d 202, 959 P.2d 360] ["dueling experts offered considerable testimony debating the reasonableness of the highway patrol officers' attempts to subdue Wilkes while holding shotguns"].) In *Calatayud*, the court noted the " 'difficult problems' of determining causation [citation] are multiplied in cases turning on the propriety of chosen *police tactics* or *emergency procedures* and in reality may simply involve a judgment call on the part of the officer who inadvertently inflicts injury." (*Calatayud*, at p. 1071, italics added.) Plaintiffs cite no opinion in which expert testimony was admitted on the objective reasonableness of a private citizen's use of force.

## II

### *Prejudice*

We also conclude the admission of Reitz's testimony was prejudicial. "The trial court's determinations on the admissibility of expert evidence are subject to review under the deferential abuse of discretion standard. [Citation.] The erroneous admission of evidence requires reversal of a judgment only when it results in a 'miscarriage of justice.' (Evid. Code, § 353, subd. (b).) The admission of improper evidence results in a miscarriage of justice only if ' "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." ' " (*Rappaport v. Gelfand* (2011) 197 Cal.App.4th 1213, 1229 [129 Cal.Rptr.3d 670].)

Sanner was greatly disadvantaged because—presumably realizing expert testimony was inadmissible—he designated no expert to refute Reitz's opinions. Adding insult to injury, plaintiffs' attorney emphasized in closing argument that the "defense didn't bring an expert in to say [Reitz] was wrong or explain to you why he was wrong or anything of the nature. His testimony stands unopposed and unrebutted, so I think you should remember what he had to say."

Additionally, the court essentially allowed Reitz to instruct the jury on his view of applicable legal principles and standards, even though he is unqualified to do so and the court has the exclusive duty to instruct the jury. Reitz erroneously advised the jury the "standard which is always applied is what we call reasonableness, but it *goes beyond that which is objective reasonableness*." (Italics added.) Reitz also erroneously advised the jury that a necessity defense fails unless the "individual who is posing that threat has . . . the ability to carry out that threat, and he has . . . the intent of carrying out that threat." The right of self-defense, however, "is not limited by actualities." (*Vaughn v. Jonas* (1948) 31 Cal.2d 586, 599 [191 P.2d 432].) "[T]he law of self-defense is a law of necessity [and] courts should never lose sight of the fact that the necessity may be either real or *apparent*." (*Id.* at p. 600, italics added.) The jury was left with the impression that if it found the intruders intended no harm to Sanner, his conduct was unreasonable per se.

Further, throughout his testimony, Reitz indicated Sanner should be held to the same standards as police officers trained in the use of deadly force, or to the standards he teaches civilian students in his classes,. when the jury instructions say nothing of the sort. When asked how he formed his opinion on Sanner's lack of reasonableness, Reitz said, "[W]e teach our students [that] you have to [have] reasonable fear of your life, great bodily injury, and/or death." As to alternatives to deadly force, Reitz explained: "We teach all of our students without exception what I term a back-to-the-wall theory, and that is that you exhaust at your disposal every reasonable means short of deadly force to resolve a situation. [¶] And with police officers, this is known as the use of force continuum, which is kind of a sliding scale, but we also demand that from our students, that before you resort to deadly force, that you exhaust every other reasonable available means to avoid having to employ deadly force—things such as anger, rage, any kind of impairment due to utilizing weapons—under the influence or anything else. The whole situation changes, and we strongly encourage—we don't encourage—we demand that our students adhere to these protocols for a reason."

Reitz also testified, "Police officers often use what is known as a low-ready position where a weapon system is brought down to a low-ready position, and that positioning of the weapon system, the officer's body, in conjunction with a verbal command, has avoided many, many conflicts from escalating." Further, Reitz said, "There are a number of different alternatives. There's physical force, pain compliance, chemical agents, and so forth."

Additionally, Reitz identified himself as an expert marksman, and relayed his own experiences in avoiding the use of deadly force, implying Sanner should have had the same restraint. Reitz was asked, "[D]id you have to apply the same principles regarding the use of deadly force that you've told

us about here this morning?" and he said "Yes." He also responded affirmatively to this question: "Were there times when you, even when you were under fire, that you felt it necessary to refrain from using deadly force?" He went on to give a detailed narration of an incident during the "Los Angeles riots," in which he and other officers were being shot at, but "we couldn't return fire because we couldn't do so without hazarding people that were innocent that were within the projects."

 There is no indication, however, that Sanner had any type of education, training or expertise in the use of firearms or self-defense. Expert opinion " ' "may not be based on assumptions of fact that are without evidentiary support or based on factors that are speculative or conjectural, for then the opinion has no evidentiary value and does not assist the trier of fact." ' " (*Lopez v. City of Los Angeles* (2011) 196 Cal.App.4th 675, 689 [126 Cal.Rptr.3d 706].) Reitz's testimony indicated he reached his conclusion on the ultimate question in dispute—the reasonableness of Sanner's conduct—based on a false premise.

Moreover, Reitz has impressive credentials as an educator and authority figure with the LAPD for more than 29 years. Substantial danger exists that the jury simply adopted Reitz's unrefuted opinions rather than drawing its own, even in light of instructions that the jury was the trier of fact and it could reject expert testimony. This danger was amplified by Reitz's testimony he does not enjoy testifying as an expert witness, he turns down most court cases offered to him, and he only takes a case if he "wholeheartedly and truly believe[s] in the case itself." Reitz's testimony was the focal point of plaintiffs' case, and it was in the nature of zealous advocacy.[4] Under all the circumstances, the trial court's ruling constitutes a miscarriage of justice.

III

*Burton's Appeal*

Burton has also appealed, contending he is entitled to recover his expert witness fees under Code of Civil Procedure section 998, and prejudgment interest under Civil Code section 3291. As he is no longer a prevailing party, these issues are moot.

---

[4] For instance, it was rather absurd for Reitz to testify that Sanner could have avoided the use of force during the incident of August 9 based on his training in crisis management as a psychiatric technician. The matter is beyond Reitz's expertise, and further, he ignored obvious differences between a controlled medical setting and an intrusion by five persons at Sanner's home at 2:00 a.m., with one of the persons opening a back window. Sanner testified that to defuse a crisis at work with a single patient, he would have the backup of four or more trained employees "so that no one gets hurt. You have to have access to the four-point soft ties. You have to have access to the I.M. medications. Everything has to be in place before you can start."

## DISPOSITION

The judgment is reversed. Sanner is entitled to costs on appeal.

Benke, J., and O'Rourke, J., concurred.