Filed 6/14/13  Samarkos v. Goddard CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| ANDREA SAMARKOS, | D060052 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. 37-2009-00063736-CU-PA-EC) |
| THOMAS E. GODDARD, | |
| Defendant and Appellant. | |


APPEAL from a judgment of the Superior Court of San Diego County, Eddie C. Sturgeon, Judge.  Reversed.


Walters & Caietti; Law Office of Cherie A. Enge and Cherie A. Enge for Defendant and Appellant.

Boudreau Williams, Jon R. Williams; Law Offices of George de la Flor and George L. de la Flor for Plaintiff and Respondent.

Thomas E. Goddard appeals the judgment entered on a jury verdict awarding Andrea Samarkos compensatory and punitive damages for personal injuries she sustained

when Goddard, while drunk, drove his vehicle into the rear end of Samarkos's stopped vehicle. Goddard attacks the judgment on grounds of erroneous evidentiary rulings, instructional errors, and misconduct by Samarkos's trial counsel. We conclude two of the challenged evidentiary rulings were prejudicially erroneous and therefore reverse the judgment.

I

FACTUAL BACKGROUND

While Samarkos was in her vehicle stopped at an intersection, Goddard drove his vehicle into the back of hers. Although Samarkos was wearing her seatbelt, she "flew forward." When she recoiled, she felt "a burst or a pop" in her lower back, and hit her head on the headrest. Samarkos also felt a "sensation just go up [her] back and down [her] butt to [her] sides," as well as "tightness" in her neck and shoulders.

Immediately after the collision, Samarkos drove through the intersection and pulled over to the curb to summon emergency assistance. An ambulance arrived and transported Samarkos to a nearby hospital, where she was examined briefly, given a prescription, and discharged with instructions to follow up with her regular physician.

Samarkos's physical condition worsened over the next few days. She experienced "immense pain where it felt like somebody was stabbing [her] in [her] lower back." She also had "right shoulder tightness, neck tightness, but that was secondary . . . to the extreme . . . lower back pain."

During the two years following the collision, Samarkos consulted numerous health care providers, who ran various diagnostic tests and prescribed different treatments but

2

were unable to cure the constant, stabbing pain in her lower back. Approximately two years after the collision, Samarkos had an episode of "excruciating" pain in her back and right lower limb, which required her "to crawl from the bathroom to [her] bed because the pain and the discomfort [were] so bad." A physician found a change in Samarkos's physical examination; and a radiological study revealed a herniated intervertebral disc in the lumbosacral region, which was pressing on her spinal nerves.

By the time of trial, Samarkos still had chronic back pain, but stated "every day is different." On some days, the pain was so severe that she had to crawl from one room to another. The only pain-free day Samarkos recalled was the day immediately following her receipt of an epidural injection.

As a result of the back pain Samarkos has suffered since the collision, she has been "limited in all daily activities." She wakes up very stiff in the morning but gets more flexible as the day goes on. Because Samarkos has such difficulty leaning forward and bending in the morning, to save time getting ready for work in the morning she washes her face and hair the prior evening, when she is more flexible. Samarkos has trouble standing for more than 10 minutes at a time; walking is also painful for her; and sitting in a chair is even more difficult than walking. She also has difficulty getting into and out of her car because she is "sore" and her "back hurts." Even such simple tasks as grocery shopping can be "a challenge."

As a further result of her constant, post-collision back pain, Samarkos's lifestyle has changed significantly. Before the collision, she was socially active. She took weekly shopping trips with her mother, regularly dined out and traveled with family and friends,

and spent weekends with her boyfriend and his children. Samarkos was also physically active before the collision. She walked daily and participated in Pilates classes, and, as a result, was able to reduce her clothing size from 14 to 10 and her weight to 160 pounds. After the collision, however, Samarkos no longer dates her boyfriend, takes shopping trips with her mother, or dines out or travels with her friends. She cannot exercise and has gained 100 pounds. In sum, after the collision Samarkos has "pretty much curtailed everything."

## II

## PROCEDURAL BACKGROUND

Samarkos sued Goddard for negligence to recover damages for the personal injuries she sustained in the collision. Samarkos also sought punitive damages based on Goddard's drunkenness at the time he drove his vehicle into hers. (See *Taylor v. Superior Court* (1979) 24 Cal.3d 890, 892 [operating motor vehicle while intoxicated may support award of punitive damages if circumstances disclose conscious disregard of probable dangerous consequences].)

The case proceeded to a bifurcated jury trial. In the first phase, Goddard admitted he was negligent and drunk when the collision occurred. By special verdict, the jury found Goddard's negligence was a substantial factor in causing harm to Samarkos, and awarded her $53,118 for economic losses plus $116,000 for pain and suffering, for a total of $169,118 in compensatory damages. The jury also found that by driving while drunk Goddard had engaged in conduct with malice and oppression. In the second phase of the trial, the jury awarded Samarkos $55,000 in punitive damages.

4

The trial court entered judgment in favor of Samarkos and against Goddard for $224,118 in damages. It later awarded Samarkos costs of $14,712.

III

DISCUSSION

Goddard challenges the judgment on several grounds: (1) erroneous exclusion of video surveillance footage of Samarkos performing daily activities; (2) erroneous admission of evidence of Samarkos's financial condition; (3) erroneous exclusion of evidence of fines paid by Goddard in a criminal case that arose out of the collision; (4) misconduct by Samarkos's counsel during examination of witnesses and closing argument; and (5) erroneous jury instructions regarding negligence per se. As we shall explain, the first two errors of which Goddard complains have merit and require reversal of the judgment. We therefore need not, and do not, address his other claims of error.

A.    *The Trial Court Prejudicially Erred by Excluding Video Surveillance of Samarkos*

Goddard's primary claim of error on appeal is that the trial court erred by excluding certain video surveillance footage showing Samarkos performing daily activities without difficulty on 15 separate occasions over a three-year period. After setting forth relevant additional background, we shall analyze this claim of error.

1.    *Additional Background*

Goddard hired a private investigator to follow Samarkos and observe her activities over a three-year period. The investigator obtained video recordings of Samarkos on at least 15 separate occasions. The footage depicted Samarkos at different times of day in various public locations performing the following activities: entering and exiting her car;

5

stopping at and driving away from fast food restaurants; loading items into, and unloading items from, her car; standing and chatting with a coworker outside her car; pushing a shopping cart; carrying multiple packages; walking along the sidewalk in a business area; and bending over to play with a dog or to pick up something from the ground. The entire video surveillance footage offered by Goddard runs for one hour 28 minutes. When we reviewed the video, however, we noticed footage from two days is included twice, and elimination of this duplication reduces the total running time to approximately one hour 20 minutes.

Samarkos moved in limine to exclude all of the video surveillance evidence. Although the motion papers are not included in the record, it appears from the transcript of the hearing on the motion that Samarkos sought to exclude the video surveillance footage on the grounds it was irrelevant (Evid. Code, § 350) or, alternatively, any probative value of the evidence was substantially outweighed by the probability of undue consumption of time, undue prejudice, confusion of issues, or misleading the jury (*id.*, § 352). Before the hearing on the motion, the trial court tentatively ruled that it would grant the motion "with the exception of true impeachment." At the hearing, Goddard argued that "a video depiction of [Samarkos's] acts, activities, body movements, [and] facial gestures are all relevant to the claims that she's making for personal injuries in this lawsuit"; and that "the video should come in not just [for] impeachment, but as true depictions of [Samarkos's] abilities that are similar to those that she claims she cannot do." The court postponed a final ruling on the in limine motion to await Samarkos's

6

testimony, after which it would "make a determination whether it's relevant" and "look at [Evidence Code section] 352 objections."

At a break in the proceedings during the cross-examination of Samarkos, the trial court indicated that, based on her testimony to that point, it was not inclined to admit any of the video surveillance footage into evidence. The court again reserved a final ruling until completion of Samarkos's testimony.

After Samarkos finished testifying, the trial court conferred with counsel outside the presence of the jury. The court ruled that the video surveillance footage could only be used for "true impeachment"; and after having "looked at it," the court admitted footage from one day only.

The jury subsequently viewed four minutes of video surveillance footage from one day, which depicted Samarkos unloading several packages from her car, leaning forward, bending over to play with a dog, and walking on sidewalk and grass. In the footage, Samarkos did not manifest any difficulty performing these tasks; and she did not grimace, wince, or otherwise indicate she was in pain.

During cross-examination of the private investigator who conducted the surveillance, Samarkos's trial counsel asked the investigator whether he observed Samarkos on at least 15 different days over three years. The investigator responded: "Yes, it was more than that, actually." When Goddard's trial counsel asked the investigator on redirect examination whether he had "observed her on any of the other 15 days, 15 plus days," Samarkos's trial counsel objected that the question went beyond the

7

scope of cross-examination. The trial court sustained the objection and stated, "We're not going to go there."

During closing argument, Samarkos's trial counsel reminded the jury that Goddard "showed [the jury] a day's worth of film," even though the investigator had "followed [Samarkos] around for 15 days over 2009, '10, '11." Referring to only the one day of footage, he later argued "that is all that they have. That is all that they have."

2.      *Legal Analysis*

Goddard contends the trial court prejudicially erred by excluding all of the video surveillance footage except that from one day because the excluded footage was relevant to the issues of the nature and extent of Samarkos's injuries and damages; and the video presentation would not have consumed an inordinate amount of time, unduly prejudiced Samarkos, confused the issues, or misled the jury. Samarkos counters that the court properly excluded the bulk of the footage because it was cumulative of the portion shown to the jury; the portion shown was sufficient to allow Goddard to argue that Samarkos was not being truthful about the nature and extent of her injuries and limitations; and admission of additional footage would have introduced collateral matters confusing to the jury. We agree with Goddard for the reasons discussed below.

a.      *Standard of Review*

A trial court has broad discretion in determining the relevancy of evidence and its admissibility under Evidence Code section 352. (*People v. Ortiz* (1995) 38 Cal.App.4th 377, 386; *Smith v. Brown-Forman Distillers Corp.* (1987) 196 Cal.App.3d 503, 519-520; *Milton v. Montgomery Ward & Co., Inc.* (1973) 33 Cal.App.3d 133, 138.) "Rulings

regarding relevancy and Evidence Code section 352 are reviewed under an abuse of discretion standard." (*People v. Lee* (2011) 51 Cal.4th 620, 643; accord, *Smith*, at pp. 519-520.) This standard "is 'deferential,' but it 'is not empty.' [Citation.] '[I]t asks in substance whether the ruling in question "falls outside the bounds of reason" under the applicable law and the relevant facts [citations].'" (*People v. Giordano* (2007) 42 Cal.4th 644, 663.) Although a trial court's discretionary ruling regarding the admissibility of evidence rarely is disturbed on appeal, reversal may be required if the court applied the wrong legal standard (*Miyamoto v. Department of Motor Vehicles* (2009) 176 Cal.App.4th 1210, 1218-1219), or if its ruling exceeds the bounds of reason under the particular facts of the case (*Burton v. Sanner* (2012) 207 Cal.App.4th 12, 18, 22 (*Burton*)). Applying these tests with due deference to the trial judge who viewed the excluded video surveillance footage, we conclude the challenged ruling was erroneous.[1]

  b.     *Relevancy*

To the extent the trial court ruled the excluded video surveillance footage was irrelevant because it was not "true impeachment," it erred in two ways: (1) the footage did impeach Samarkos's testimony, and (2) the court applied the wrong legal standard by focusing exclusively on the impeachment value of the evidence. "'Relevant evidence'

---

[1]     The record is not clear whether the trial court ultimately decided to exclude almost all of the footage because it was irrelevant (Evid. Code, § 350), or because its probative value was substantially outweighed by the probability that its admission would require an undue amount of time, or would create substantial danger of undue prejudice, confusing the issues, or misleading the jury (*id.*, § 352). The parties discuss both grounds in their briefing. We therefore analyze both.

9

means evidence, *including evidence relevant to the credibility of a witness or hearsay declarant*, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210, italics added.) Thus, evidence is relevant *not only* if it impeaches a witness's credibility (*Granville v. Parsons* (1968) 259 Cal.App.2d 298, 304), *but also* if it tends logically, naturally, or by reasonable inference to establish or negate a material disputed fact (*Grimshaw v. Ford Motor Co.* (1981) 119 Cal.App.3d 757, 787). The excluded video surveillance footage satisfied *both* of these standards for relevancy.

The main issues disputed at trial included the nature of Samarkos's injuries and the limitations they place on her daily activities. Samarkos testified that although "every day is different," she has constant back pain that makes it difficult to walk, lean forward, bend over, and perform simple tasks of daily living, such as grocery shopping. The video surveillance footage directly contradicted this testimony by depicting Samarkos performing some or all of these tasks without any trouble on 15 separate occasions over a three-year period. Consequently, the footage was relevant not only because it impeached Samarkos, but also because it constituted demonstrative evidence — independent of her testimony — that tended to disprove her claims that she is "limited in all daily activities" and has "pretty much curtailed everything." (See Evid. Code, § 210; *Jones v. City of Los Angeles* (1993) 20 Cal.App.4th 436, 442 (*Jones*) [" 'Day in the Life' " videotape of injured plaintiff was "relevant on the issue of damages" and "highly probative of the extent of [her] injuries"].) Indeed, Samarkos acknowledged in her briefing that the footage had probative value *both* "to impeach Samarkos'[s] credibility about the nature and extent of

10

her injuries . . . , *and* to support Goddard's theory that [she] was a mere malingerer."[2] (Italics added.)  Furthermore, because all of the video surveillance footage was relevant, it was presumptively admissible.  (See Evid. Code, § 351 ["Except as otherwise provided by statute, all relevant evidence is admissible."]; *Heiman v. Market St. Ry. Co.* (1937) 21 Cal.App.2d 311, 314 [in personal injury action, trial court properly admitted film showing plaintiff who claimed to be invalid driving in heavy traffic; "shopping, walking, stooping and bending without assistance from anyone"; and "carrying grocery bundles"].)  The trial court therefore erred by excluding the footage on the ground it was not "true impeachment" and, for that reason, was irrelevant.

        c.     *Evidence Code Section 352*

The trial court also erred to the extent it relied on Evidence Code section 352 to exclude all the video surveillance footage except four minutes obtained on one day.  Under section 352, a court "may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of

---

[2]    We reject Samarkos's unsupported assertion that the excluded video surveillance footage had "an attenuated connection to [her] claims, as most of it failed to depict specific activities Samarkos said she could no longer pursue."  Samarkos claimed that as a result of the collision, she suffered chronic back pain, was "limited in all daily activities," and "pretty much curtailed everything."  The excluded footage depicted her standing, bending, stooping, walking, shopping, socializing, and otherwise going about her daily business on multiple occasions without obvious impairment.  Although the footage did not depict Samarkos while she was at the gym, shopping with her mother, out to dinner with friends, on a date with a man, or on a vacation, the footage showed she did not suffer the severe pain and mobility limitations that she claimed prevented her from engaging in those specific activities.

11

misleading the jury."  For evidence properly to be excluded under section 352, the record must affirmatively show that the trial court weighed the probative value of the evidence against the probability its admission would waste time, cause undue prejudice, confuse the issues, or mislead the jury.  (*People v. O'Shell* (2009) 172 Cal.App.4th 1296, 1309-1310; *Burns v. 20th Century Ins. Co.* (1992) 9 Cal.App.4th 1666, 1674.)  "This requirement provides 'the appellate courts with the record necessary for meaningful review' and 'ensure[s] that the ruling' is '"the product of a mature and careful reflection on the part of the judge."'"  (*O'Shell*, at p. 1310; see also *Andrews v. City and County of San Francisco* (1988) 205 Cal.App.3d 938, 947 [record must show trial court "exercise[d] its discretion in an informed manner, as section 352 requires"].)  Here, although the trial court mentioned section 352 in its first tentative ruling on Samarkos's motion in limine to exclude the video surveillance footage and the parties argued whether the evidence was excludable on that ground, the record "is unclear and confusing" as to whether the court actually analyzed the various factors listed in the statute and concluded they weighed in favor of exclusion.  (*People v. Wright* (1985) 39 Cal.3d 576, 583.)  "The failure of the court to discharge its statutory duty to weigh for the record the probative value of this evidence against its potential prejudice was error."  (*Ibid*.)  In any event, as we explain in detail below, the footage could not have been properly excluded on the basis of section 352 because "the probative value of the evidence here was significant, while its prejudicial effect was minimal at best."  (*Wright*, at p. 583.)

In performing the balancing test required by Evidence Code section 352, a trial court first assesses the "probative value" of the evidence sought to be excluded.  Here, the

12

excluded video surveillance footage had substantial probative value. As objective depictions of Samarkos going about her daily life in real time on 15 separate occasions over the course of three years, the footage constituted some of the best evidence of her physical limitations. (See, e.g., *People v. Mattson* (1990) 50 Cal.3d 826, 871 (*Mattson*) [photographs were "best evidence" of actual conditions of victim's body]; *Rodriguez v. McDonnell Douglas Corp.* (1978) 87 Cal.App.3d 626, 663 (*Rodriguez*) [photographs of plaintiff's body were relevant to issues of nature and extent of injuries and adequate compensation].) In addition, the footage "was highly probative of the extent of [Samarkos's] injuries and graphically demonstrated her [limitations] in a manner oral testimony could not convey. It also had substantial probative value on the extent of [her] pain and suffering and was therefore helpful to the jury in calculating appropriate damages." (*Jones*, *supra*, 20 Cal.App.4th at p. 442.)

Against the probative value of the evidence, the trial court weighs the probability that admission of the evidence sought to be excluded would take too much time or would create substantial danger of undue prejudice, confusing the issues, or misleading the jury. (Evid. Code, § 352.) None of these countervailing factors applies to this case.

Playing the excluded video surveillance footage for the jury would not have "necessitate[d] undue consumption of time." (Evid. Code, § 352.) Courts typically exclude evidence on this ground "to preclude [a] cumulative and time-consuming duplication of inquiry" (*Vossler v. Richards Manufacturing Co.* (1983) 143 Cal.App.3d 952, 960), or to prevent the case from being sidetracked on a collateral matter when the probative value of the evidence is low (see, e.g., *People v. Lightsey* (2012) 54 Cal.4th

13

668, 714; *Notrica v. State Comp. Ins. Fund* (1999) 70 Cal.App.4th 911, 950).[3]  Those concerns are absent here.  Although the excluded footage is somewhat repetitive in that it shows Samarkos doing some of the same things depicted in the footage played for the jury*, the excluded footage shows her on different days, at different times of day, and also doing other things*.  In light of Samarkos's claim that her pain and mobility varied from day to day and also throughout the course of any given day, it was important for the jury to see her going about her daily life on multiple days and at different times of day.  The excluded footage therefore was not, as Samarkos erroneously contends, merely "cumulative."  (See *People v. Filson* (1994) 22 Cal.App.4th 1841, 1850 [evidence is cumulative only if "other evidence on the point at issue has already been introduced"].)

Nor was the video surveillance footage unduly lengthy.  Removal of the duplicative two days reduces the total running time to one hour 20 minutes — a fraction of the time taken for testimony from Samarkos, her mother, coworkers, friends, and

---

[3]     Citing *People v. Brooks* (1980) 26 Cal.3d 471, 482, Samarkos suggests that under Evidence Code section 352, a trial court has discretion to limit the presentation of evidence to avoid a "'tedious and superfluous proceeding[].'"  *Brooks* is not on point, however, because it did not consider the issue involved in this appeal, namely, whether the trial court abused its discretion by excluding evidence under section 352.  *Brooks* involved a motion to suppress evidence that was made on multiple grounds.  The issue before the Supreme Court was whether the trial court abused its discretion by determining that presentation of evidence on additional grounds was unnecessary once the court had determined to grant the motion on the first ground asserted by the defendant.  (*Brooks*, at p. 482.)  Deciding whether particular evidence is necessary to decide a pretrial motion made on multiple grounds is not analogous to deciding whether particular evidence offered at trial is substantially more prejudicial than probative, and the factors that guide the court's exercise of discretion in the two situations are very different.  *Brooks* thus has no application to the evidentiary ruling challenged here.

14

health care providers about her injuries and limitations. Even if the trial court considered one hour and 20 minutes too much time to devote to the video surveillance footage, the court could have shortened Goddard's presentation further. Indeed, Goddard asserts in his briefing that he offered to limit his presentation at trial to 27 minutes of footage from five different days. That apparently would have been sufficient for Goddard's purposes and would not have been unduly time-consuming.

Finally, and most importantly, the excluded footage bore directly on one of the main issues in dispute at trial, namely, the nature of Samarkos's injuries and the limitations they place on her everyday activities. "'Presentation of evidence at the heart of the defense would not have represented an "undue" consumption of time.'" (*People v. Minifie* (1996) 13 Cal.4th 1055, 1070; accord, *O'Mary v. Mitsubishi Electronics America, Inc.* (1997) 59 Cal.App.4th 563, 576 (*O'Mary*).)

There also was no likelihood that showing the jury more than four minutes of the video surveillance would have "create[d] substantial danger of undue prejudice." (Evid. Code, § 352.) Section 352 uses the word "prejudice" in its etymological sense of prejudging a person or cause based on extraneous factors. (*Vorse v. Sarasy* (1997) 53 Cal.App.4th 998, 1009.) "Undue prejudice under section 352 occurs when the jury is emotionally inflamed against a party without regard to the issues in the case." (*Smalley v. Baty* (2005) 128 Cal.App.4th 977, 985.) Thus, "evidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction. In such a

15

circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose." (*Vorse*, at p. 1009; accord, *People v. Scott* (2011) 52 Cal.4th 452, 491.) There was no risk of such prejudice here because the excluded footage does not depict extraneous matter or anything grotesque, violent, obscene, embarrassing, or otherwise inflammatory. Rather, as Samarkos stated in her briefing, it depicts her engaged in "innocuous conduct that reflected daily living" — precisely the type of conduct she claimed has been limited as a result of the collision.

Finally, playing the excluded video surveillance footage would not have "create[d] substantial danger . . . of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) The nature of Samarkos's injuries and the associated limitations on her daily activities were among the key issues disputed at trial. Those issues are not complicated, and the excluded footage bears directly on them. (See, e.g., *People v. Cudjo* (1993) 6 Cal.4th 585, 609, 610 (*Cudjo*) [abuse of discretion to exclude testimony due to danger of confusion of issues when testimony was "highly material" to "primary defense" and "issue was already there"]; *People v. McAlpin* (1991) 53 Cal.3d 1289, 1310, fn. 15 [same when excluded testimony "was limited to the main issue in the case" and "would not have raised any new question"]; *O'Mary*, *supra*, 59 Cal.App.4th at p. 576 [abuse of discretion to exclude evidence that "went to the very heart of the case"].)

On balance, then, the probative value of the video surveillance footage that Goddard sought to introduce at trial was not substantially outweighed by the danger of undue prejudice, confusing the issues, misleading the jury, or undue time consumption. Therefore, the footage could not properly have been excluded on the basis of Evidence

16

Code section 352. (See *Cudjo*, *supra*, 6 Cal.4th at p. 609 ["Unless these dangers 'substantially outweigh' probative value, the objection must be overruled."]; *O'Mary*, *supra*, 59 Cal.App.4th at p. 574 [abuse of discretion to exclude highly probative evidence when there was little risk of prejudice]; *Jones*, *supra*, 20 Cal.App.4th at p. 443 ["only where the photographs have little probative value, are cumulative of other testimony and are calculated to inflame the jury, can an appellate court conclude the discretion conferred upon the trial court pursuant to Evidence Code section 352 should be exercised in favor of exclusion"].)

        d.    *Prejudice*

Having concluded the trial court erred by excluding all but one day of the video surveillance footage, we must determine whether that error was prejudicial. We may not reverse a judgment based on the erroneous exclusion of evidence unless the error "resulted in a miscarriage of justice." (Cal. Const., art. VI, § 13; Evid. Code, § 354.) Error in excluding evidence constitutes a miscarriage of justice only if the appellant shows that a different result would have been reasonably probable had the evidence been admitted. (*Burton*, *supra*, 207 Cal.App.4th at p. 22; *Winfred D. v. Michelin North America, Inc.* (2008) 165 Cal.App.4th 1011, 1038 (*Winfred D.*); *O'Mary*, *supra*, 59 Cal.App.4th at pp. 576-577.) Under this standard, the trial court's exclusion of the bulk of the video surveillance footage requires reversal.

At trial, the most vigorously contested issues were the nature of Samarkos's injuries and the limitations they place on her daily activities. Goddard correctly asserts that some of "the best evidence of [Samarkos's] actual injuries suffered as a result of the

17

subject accident is the videotape," which illustrates in a vivid and objective way the limitations (or lack thereof) on her daily activities. (See *Mattson*, *supra*, 50 Cal.3d at p. 871 [photographs were "best evidence" of actual conditions of victim's body]; *Jones*, *supra*, 20 Cal.App.4th at p. 442 [videotape of injured plaintiff "was highly probative of the extent of [her] injuries and graphically demonstrated her [limitations] in a manner oral testimony could not convey"].) Goddard also legitimately complains that it was unfair to "limit [the video presentation] to only one day," because Samarkos testified the severity of her back pain and the degree of limitation on her mobility varied from day to day. Having seen Samarkos easily walking, lifting, bending, and otherwise moving about *on only one day*, the jury might well have concluded the private investigator recorded her on a "good" day, and the video was not truly representative of Samarkos's physical limitations. Indeed, Samarkos's counsel suggested that conclusion during closing argument by reminding the jury that Goddard produced footage from only one day, even though the investigator followed Samarkos on more than 15 days over a three-year period; and then twice asserted, "That is all that they have." Counsel of course knew that was not all Goddard had. Had the jurors in fact seen "all that they ha[d]" — Samarkos walking, shopping, carrying packages, getting into and out of her car, loading and unloading her car, and otherwise going about her business without obvious pain or difficulty *on 15 different days over a three-year period* — there is a reasonable probability the jury would have concluded she did not suffer the injuries or limitations on her daily activities she claimed at trial. (Cf. *Burton*, *supra*, 207 Cal.App.4th at p. 22 [error in admitting expert testimony was prejudicial when plaintiff's counsel emphasized

18

in closing argument that defendant called no expert].)  The jury might also have concluded Samarkos was not credible and discounted her testimony on other issues in the case as well, causing it to reach a different verdict.  (Cf. *O'Mary*, *supra*, 59 Cal.App.4th at p. 576 [erroneous exclusion of evidence was not harmless when evidence bore on issue that was "the very core of the case" and affected credibility of key witness on issue, and its admission "might have easily made a difference"].)

In sum, we agree with Goddard that the jury needed to see more than four minutes of surveillance footage from one day "to be able to make a fair assessment of adequate compensation for [Samarkos's] alleged injuries."  (See *Jones*, *supra*, 20 Cal.App.4th at p. 442 ["'Day in the Life'" videotape of injured plaintiff was "helpful to the jury in calculating appropriate damages"]; *Rodriguez*, *supra*, 87 Cal.App.3d at p. 663 [photographs of plaintiff's injuries were properly admitted "to guide the jury in making a fair assessment of adequate compensation for such injuries"].)  The trial court's erroneous exclusion of all of the remainder of the footage thus caused a miscarriage of justice that requires reversal of the judgment.  (Cal. Const., art. VI, § 13; Evid. Code, § 354; *Winfred D.*, *supra*, 165 Cal.App.4th at p. 1040; *O'Mary*, *supra*, 59 Cal.App.4th at pp. 566-567, 585.)

B.      *The Trial Court Prejudicially Erred by Admitting Testimony About a Loan Samarkos Received from Her Mother*

Goddard also argues the trial court prejudicially erred by admitting evidence that Samarkos received a loan from her mother to pay medical expenses.  We again shall provide additional facts and then analyze this contention.

19

1.      *Additional Background*

During the direct examination of Samarkos's mother, Samarkos's counsel asked whether she had to loan Samarkos money after the collision.  Goddard's counsel objected on relevancy grounds.  The trial court overruled the objection.  Samarkos's mother then testified she loaned Samarkos $50,000 after the collision because Samarkos was not working the hours or earning the bonuses she had in the past, and she had "a lot of medical expenses."

Samarkos's trial counsel brought up the loan again during redirect examination of Samarkos's mother.  The mother testified she gave Samarkos the $50,000 "to just help her out because she had so many medical expenses."

Samarkos herself also gave testimony about the loan.  On direct examination, she testified that she needed to borrow money from her parents because her "medical bills got [to be] too much for [her] to handle."  She further testified that at no time before the collision that injured her back had she ever had to borrow money from her parents, and borrowing the $50,000 after the collision made her feel "like [she] was a little kid."

2.      *Legal Analysis*

Preliminarily, we must address Samarkos's argument that Goddard has not preserved his claim of error regarding the testimony about the loan.  Samarkos contends that Goddard did not (1) include in his opening brief a citation to the record showing he made an objection that the testimony should be excluded under Evidence Code section 352, or (2) seek an instruction limiting the jury's use of the testimony.  Our review of the record disclosed that Goddard did not object to the testimony about the loan

20

on the basis of section 352, and we thus deem his claim of error forfeited to the extent it relies on that statute. (See, e.g., *Duronslet v. Kamps* (2012) 203 Cal.App.4th 717, 726 [grounds for objection not asserted in trial court may not be asserted on appeal].) Nevertheless, Goddard did specifically object to that testimony on the ground it was irrelevant, and his opening brief includes argument and authorities supporting his claim of error on that basis. Goddard thus preserved his claim of error to that extent; he did not also have to seek a limiting instruction, notwithstanding Samarkos's unsupported assertion to the contrary. (See, e.g., *People v. Partida* (2005) 37 Cal.4th 428, 435 [grounds for objection asserted in trial court are preserved for appeal]; *Short v. Frink* (1907) 151 Cal. 83, 87 ["Where the question upon its face shows that the testimony called for is necessarily inadmissible, the rights of a party are fully preserved by his objection to the proposed evidence, and his exception to the ruling admitting the same."].)

Turning to the merits, we conclude the trial court should have excluded as irrelevant the testimony about the $50,000 loan Samarkos obtained from her mother. "No evidence is admissible except relevant evidence." (Evid. Code, § 350.) "The general financial condition of the plaintiff was immaterial and irrelevant to the question of damages, or to any issue in the case." (*Johnston v. Beadle* (1907) 6 Cal.App. 251, 253 (*Johnston*).) As our Supreme Court long ago explained:

> Evidence of a plaintiff's poverty "ha[s] no pertinent or competent bearing upon the extent of injury suffered by plaintiff[], for which defendant could be held responsible, and its only effect and inevitable tendency was undoubtedly to excite the sympathies of the jury and improperly influence their finding upon the question of damages. Such evidence is never admissible in a case of this character, for the very simple reason that the extent of a defendant's responsibility for the results of his negligence is not

21

to be measured by the condition as to affluence or poverty of the injured party at the time of suffering the injury, since that is a condition for which the defendant is in no way responsible . . . ." (*Green v. Southern Pac. Co.* (1898) 122 Cal. 563, 564-565; accord, *Story v. Green* (1913) 164 Cal. 768, 770; *Wilbur v. Emergency Hospital Assn.* (1915) 27 Cal.App. 751, 760.)

Thus, "[i]t seems to be the rule, supported by a long line of decisions in this state and elsewhere, that evidence of the plaintiff's poverty is inadmissible in an action to recover damages for personal injuries." (*Steinberger v. California Electric etc. Co.* (1917) 176 Cal. 386, 389-390 (*Steinberger*); accord, *Wright v. Broadway Department Store* (1926) 199 Cal. 562, 567.)

Ignoring these controlling authorities and citing no others, Samarkos argues the testimony concerning the loan was admissible because it (1) showed the medical expenses she incurred as a result of the collision "had a tangible financial impact upon her" and (2) "illuminated the 'anxiety' element of her noneconomic damages resulting from Goddard's conduct." We disagree. Although the need for a loan indicated the collision-related medical expenses had an adverse financial effect on Samarkos, proof of such an effect was irrelevant because she was entitled to recover those expenses as part of her damages regardless of her ability to pay them. (See *Hanif v. Housing Authority* (1988) 200 Cal.App.3d 635, 640 [person injured by tort of another is entitled to recover reasonable medical expenses attributable to tort]; *Johnston*, *supra*, 6 Cal.App. at p. 253 [general financial condition of plaintiff is irrelevant to question of damages].) The need for a loan to pay medical expenses was also inadmissible as proof that Samarkos suffered anxiety for which she should be awarded noneconomic damages. According to the California Supreme Court:

22

"To allow such evidence to go in under the plea that it forms an element to be considered in weighing the worry or other mental suffering occasioned to the plaintiff would be to open the door to its admission in all cases of this kind. Every person sustaining physical injuries will suffer mentally. If, under the guise of showing the extent of such mental suffering, the plaintiff may show his poverty, and consequent worry, he may on the same ground introduce in evidence a mass of circumstances which in themselves would not be proper elements of damage because too remote or speculative, bringing them in by the claim that he suffered increased worry by brooding over these extraneous factors." (*Steinberger*, *supra*, 176 Cal. at p. 391; accord, *Dillon v. Wallace* (1957) 148 Cal.App.2d 447, 453-455.)

Thus, the testimony about the loan was not admissible for either of the purposes identified by Samarkos.

Having determined that the trial court erred by admitting the testimony about the $50,000 loan Samarkos obtained from her mother, we must determine whether that error "resulted in a miscarriage of justice" requiring reversal of the judgment. (Cal. Const., art. VI, § 13; Evid. Code, § 353.) In a negligence action in which the trial court erroneously admitted testimony that the plaintiff's decedent "was unable to take certain treatments because of the fact that he had no money and that everything he owned was mortgaged," our Supreme Court held:

"Where the element of sympathy enters into a case, the difficulty is that it is as likely to result in the giving of a verdict against the evidence of nonliability as it is to increase the verdict where a liability exists. Sympathy permeates the whole case and introduces an irrelevant factor which may result not only in the giving of an excessive verdict but a verdict where none would otherwise be given. It cannot be said, we think, that evidence of poverty, particularly where that poverty has apparently resulted from the efforts to meet obligations arising from an illness resulting from the injury in suit, is not prejudicial. The cases in this state are unanimous in holding the admission of such testimony prejudicial error sufficient to call for a reversal of the case." (*Ensign v. Southern Pac. Co.* (1924) 193 Cal. 311, 321, 322; accord, *Smellie v. Southern Pac. Co.* (1933) 128 Cal.App. 567, 577-578.)

23

We are bound by the Supreme Court's holding (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455), and therefore conclude the trial court's error in admitting the testimony about the loan requires reversal of the judgment.

## DISPOSITION

The judgment is reversed.


IRION, J.

WE CONCUR:


NARES, Acting P. J.


McINTYRE, J.

24