Filed 10/19/22  Siemon v. Regents of the U. of Cal. CA1/1
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| MELANIE L. SIEMON,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>REGENTS OF THE UNIVERSITY OF CALIFORNIA,<br><br>    Defendant and Respondent. | A160654<br><br>(City and County of San Francisco Super. Ct. No. CGC-18-564487) |

Plaintiff Melanie L. Siemon appeals from judgment entered after the trial court granted the Regents of the University of California's (Regents) motion for nonsuit.  On appeal, Siemon argues the trial court abused its discretion by precluding her expert from testifying about breach of the standard of care and causation, which resulted in her inability to offer evidence supporting her res ipsa loquitor theory.  We agree the trial court erred in excluding certain expert testimony, and accordingly reverse the order granting nonsuit and vacate the judgment.

## I.

## BACKGROUND

Following a lens removal and replacement surgery, Siemon experienced an infection.  She was subsequently diagnosed with toxic anterior segment syndrome (TASS), an inflammatory reaction resulting from contamination

1

that causes toxic damage to the eye. As a result of TASS, Siemon experienced damage to her eye, and subsequent attempts to repair the damage were unsuccessful. Siemon subsequently sued the Regents for medical negligence.[1]

Siemon retained Dr. Michael Reynard, an ophthalmologist, as an expert to opine about the diagnosis of TASS, breach of the standard of care, and Siemon's future care needs. Accordingly, Dr. Reynard prepared an expert report, which he noted was based on his review of various materials and his independent medical examination. His report described TASS, noted Siemon's treating physicians "concurred with the diagnosis of TASS," and cited other evidence in support of that diagnosis. The report discussed various causes of TASS, the harm caused to Siemon as a result of TASS, the impact on her vision, and her future care needs. As relevant to this appeal, the report reached two conclusions. First, the report stated, "With a reasonable degree of medical probability, Ms. Siemon sustained TASS as a result of [the surgery]." Second, the report concluded, "With a reasonable degree of medical probability, failure to properly clean or adequately sterilize instruments deployed in [the surgery] was responsible for the development of TASS in Ms. Siemon." The report also noted generally a failure to properly clean or adequately sterilize instruments constitutes a breach of the standard of care.

The Regents filed two motions in limine (motions in limine Nos. 10 and 15) to preclude certain evidence and testimony related to Dr. Reynard's report. First, the Regents sought to exclude Dr. Reynard from relying on or

---

[1] Siemon also sued Jennifer Rose-Nussbaumer, M.D., the doctor who performed the surgery, but Dr. Rose-Nussbaumer was dismissed from the action and is not a party to this appeal.

2

otherwise conveying to the jury any opinions expressed by Dr. Nick Mamalis.[2] That motion also sought to preclude Dr. Reynard from expressing an opinion about the standard of care and the cause of Siemon's injury. The Regents argued Dr. Reynard's testimony as to causation was speculative and lacked the requisite certainty because he could not identify any improperly sterilized surgical instrument, did not identify any evidence of improper sterilization, and failed to acknowledge various possible causes for TASS.

Second, the Regents filed a motion in limine to exclude Dr. Reynard from testifying (1) about the standard of care and causation for sterile processing and instrument cleaning, and (2) that the surgical instruments used in the surgery at issue were improperly cleaned. The Regents asserted Dr. Reynard was not identified as an expert in sterile processing and was unable to identify any instrument that was improperly sterilized or caused Siemon's injury.

At the hearing on the motions in limine, the court expressed concern that Dr. Reynard "seem[ed] to be reasoning backwards." The court noted Dr. Reynard appeared to be concluding the cause of Siemon's TASS merely due to the diagnosis of TASS, without identifying evidence "in the medical record as to the course of the substance that precipitated the TASS." The court further noted there was no evidence the instruments were not sterilized or contained debris, so it did not find a basis for Dr. Reynard to testify as to a breach of the standard of care. The court thus granted both motions in limine, but with leave for Siemon to renew her argument with any further evidence.

---

[2] Dr. Mamalis is an expert in the diagnosis and management of TASS, who submitted a declaration in support of Siemon's opposition to the Regents' motion for summary judgment.

3

At Siemon's request, the court conducted an evidentiary hearing pursuant to Evidence Code 402. Dr. Reynard testified talc powder on gloves, preservatives in fluids, antibiotics and anesthetics, and sulfates in fluids have historically been causes of TASS, but those causes were eliminated prior to Siemon's surgery. Dr. Reynard also testified that one antibiotic used after the surgery may have contained preservatives, but it was only placed on the eye after the incisions were completely sealed and thus would be "extremely unlikely" to have infected Siemon's eye. Accordingly, Dr. Reynard testified "the only remaining possibility . . . is the fact that the instruments themselves had a contaminant that was introduced into the eye at the time of surgery." Dr. Reynard also testified that studies had concluded improper instrument cleaning and sterilization was the most common cause of TASS. He concluded "[t]o a reasonable degree of medical probability . . . [a] lack of proper cleaning and sterilization led to the development of TASS in [Siemon]."

On cross-examination, Dr. Reynard acknowledged he was not offering an opinion on the adequacy of the Regents' sterilization procedures and had no personal knowledge regarding any lack of sterilization. Dr. Reynard was unable to identify a contaminant or specific instrument that was improperly sterilized, but noted such identification "under these circumstances is extremely difficult . . . because we can't reconstruct the situation." However, he explained "we know from studies . . . that improper sterilization, improper cleaning, is by far the most common reason for the development of TASS." He further explained "we have eliminated all these other variables" and improper sterilization is "[t]he only [cause of TASS] remaining." Dr. Reynard was unable to provide any statistical analysis of how frequently surgical instruments were the cause of TASS or cite specific support for his position

4

that nearly 100 percent of all TASS cases are caused by improper sterilization. Nor could Dr. Reynard identify how often improper sterilization was the cause of TASS as compared to other known causes.

Following argument of counsel, the court granted the motions as to two specific statements in Dr. Reynard's report. First, the court excluded Dr. Reynard's conclusion that Siemon sustained TASS as a result of her surgery. Second, the court excluded Dr. Reynard's statement that the failure to properly clean or adequately sterilize instruments deployed in the surgery was responsible for the development of TASS in Siemon. The court explained the mere diagnosis of TASS did not provide an evidentiary basis for Dr. Reynard to opine upon its cause. The court further noted there was no evidence as to the cause of Siemon's TASS, Dr. Reynard failed to cite any relevant statistics, the report upon which Dr. Reynard relied noted the cause of certain deposits "remains a matter of speculation," and there was no evidence that the Regents failed to sterilize the instruments.

Following Siemon's opening argument, the Regents moved for nonsuit on the basis that Siemon lacked a qualified medical expert who could opine on causation and breach of the standard of care. The court granted the motion and entered judgment in favor of the Regents. Siemon timely appealed.

## II.

## DISCUSSION

On appeal, Siemon argues the trial court erred by requiring a statistical analysis as to causation and ignoring Dr. Reynard's differential etiology approach.[3] She also contends the court failed to consider her res ipsa

---

[3] Siemon does not dispute on appeal the trial court's rejection of Dr. Reynard's statistical analysis. Accordingly, we need not address the Regents'

5

loquitor theory when evaluating the scope of Dr. Reynard's testimony and granting the Regents' motion for nonsuit. We address each argument in turn.

## A. Standard of Review

We review a trial court's decision on the admissibility of expert testimony for abuse of discretion. (*Burton v. Sanner* (2012) 207 Cal.App.4th 12, 18; *Mardirossian & Associates, Inc. v. Ersoff* (2007) 153 Cal.App.4th 257, 269 [in limine rulings reviewed for abuse of discretion].) "The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." (*Shamblin v. Brattain* (1988) 44 Cal.3d 474, 478–479.) "A ruling that constitutes an abuse of discretion has been described as one that is 'so irrational or arbitrary that no reasonable person could agree with it.' " (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773.)

## B. Order Granting the Regents' Motions in Limine

Siemon raises two arguments as to why the trial court abused its discretion in limiting Dr. Reynard's testimony. First, she contends the court failed to consider his testimony in the context of his differential etiology analysis. Second, she asserts the court failed to properly consider her res ipsa loquitor theory when excluding the expert testimony.

"Based on the provisions of Evidence Code sections 801 and 802, 'the trial court act[s] as a gatekeeper to exclude expert opinion testimony that is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies,

---

arguments regarding the validity of or basis for Dr. Reynard's statistical analysis.

or (3) speculative.' [Citation.] ' "[E]ven when the witness qualifies as an expert, he or she does not possess a carte blanche to express any opinion within the area of expertise. [Citation.] For example, an expert's opinion based on assumptions of fact without evidentiary support . . . or on speculative or conjectural factors . . . has no evidentiary value . . . and may be excluded from evidence. [Citations.]" [Citations.] "Therefore, an expert's opinion that something could be true if certain assumed facts are true, without any foundation for concluding those assumed facts exist in the case before the jury, does not provide assistance to the jury because the jury is charged with determining what occurred in the case before it, not hypothetical possibilities." ' " (*Cooper v. Takeda Pharmaceuticals America, Inc.* (2015) 239 Cal.App.4th 555, 576–577, footnotes omitted.)

### 1. *Differential Etiology*

The parties agree a differential etiology analysis can provide a valid approach to establishing causation. However, the Regents assert Dr. Reynard did not conduct a valid differential etiology analysis because he did not consider the full range of potential causes of TASS and failed to adequately rule out possible causes.

" 'Differential diagnosis, or differential etiology, is a standard scientific technique of identifying the cause of a medical problem by eliminating the likely causes until the most probable one is isolated. . . . [Citation.] . . . [¶] The first step in the diagnostic process is to compile a comprehensive list of hypotheses that might explain the set of salient clinical findings under consideration. [Citation.] The issue at this point in the process is which of the competing causes are *generally* capable of causing the patient's symptoms or mortality . . . . [¶] After the expert rules in all of the potential hypotheses that might explain a patient's symptoms, he or she must then engage in a

7

process of elimination, eliminating hypotheses on the basis of a continuing examination of the evidence so as to reach a conclusion as to the most likely cause of the findings in that particular case.' " (*Johnson & Johnson Talcum Powder Cases* (2019) 37 Cal.App.5th 292, 308, fn. 6 (*Johnson & Johnson*).)

When establishing causation, the plaintiff need not establish " 'the proximate cause of injury with absolute certainty *so as to exclude every other possible cause of a plaintiff's illness*, even if the expert's opinion was reached by performance of a differential diagnosis.' [Citation.] Instead, ' "the plaintiff must offer an expert opinion that contains a reasoned explanation illuminating why the facts have convinced the expert, and therefore should convince the jury, that it is *more probable than not*" ' that the product was a cause-in-fact of the disease. [Citation.] Then the burden shifts to the defendant to prove 'the existence of an alternative explanation, supported by substantial evidence and not mere speculation,' to defeat the plaintiffs' explanation as a matter of law." (*Pilliod v. Monsanto Co.* (2021) 67 Cal.App.5th 591, 623.)

Here, Dr. Reynard testified about the possible causes of TASS and "the individual components relative to [Siemon's] surgery." Dr. Reynard identified five other sources of TASS: (1) talc powder on gloves; (2) preservatives in fluids; (3) preservatives in antibiotics; (4) preservatives in anesthetics; and (5) sulfates in fluids. Dr. Reynard eliminated talc powder on gloves as a possible cause of Siemon's TASS because an FDA mandate prior to her surgery banned the use of talc with gloves. Likewise, Dr. Reynard testified—as a general practice—preservatives and sulfates have been eliminated from fluids and antibiotics once they were discovered to be as a cause of TASS, and thus the correlation between fluids and antibiotics and TASS has generally been eliminated. He also noted the medical community

has ceased using anesthetics with preservatives, which would eliminate any risk of TASS from anesthetics. Dr. Reynard further noted the interocular medication used in Siemon's surgery did not contain a preservative, but it was unclear whether the topical antibiotic ointment used after her surgery contained preservatives. However, Dr. Reynard noted the seals on Siemon's incisions were described as "watertight," and thus the likelihood of any postsurgery antibiotic infecting the eye was "extremely unlikely." He thus testified the "only remaining possibility" was contamination from a surgical instrument.

The Regents do not dispute that contaminated instruments *could* be a cause of TASS. Rather, they challenge Dr. Reynard's method of identifying and eliminating alternative causes. However, the Regents do not identify any potential source of TASS that Dr. Reynard omitted from his discussion and instead merely argue there could be other unspecified sources he did not discuss. Nor did Dr. Reynard fail to connect his analysis to Siemon's surgery. A fair reading of his testimony indicates that the general industry practice at the time of Siemon's surgery was to no longer use fluids, antibiotics, or anesthetics containing components shown to have caused TASS, such as preservatives and sulfates.

While there are certainly notable weaknesses in Dr. Reynard's testimony, we cannot conclude his assessment of possible causes was speculative. Nor have the Regents specifically identified any relevant cause that he failed to consider. Rather, the Regents' attack on Dr. Reynard's testimony raises a question of credibility, which is "for the jury to determine." (*Johnson & Johnson, supra*, 37 Cal.App.5th at p. 330; accord, *Barber v. Southern California Edison Co.* (2022) 80 Cal.App.5th 227, 246 [" '[c]ausation

9

is generally a question of fact for the jury, unless reasonable minds could not dispute the absence of causation' "].)

Next, the Regents cite *Johnson & Johnson, supra,* 37 Cal.App.5th 292 to argue Siemon was required to set forth an analysis grounded in the specific facts of Siemon's surgery to fully eliminate other causes. The Regents argue this "type of specific factual predicate" was lacking in Dr. Reynard's analysis.

In *Johnson v. Johnson,* the plaintiff alleged talcum powder caused her ovarian cancer. (*Johnson & Johnson, supra,* 37 Cal.App.5th at pp. 296–297.) The expert conducted a differential etiology as to potential causes, and discounted certain potential causes such as age and ovarian cycle. (*Id.* at pp. 328–329.) The trial court concluded the expert's methodology was speculative because she only "discounted" rather than "eliminated" potential causes. (*Id.* at p. 327.) The appellate court reversed, noting the expert "considered both age and number of ovulatory cycles and explained why she found them improbable as independent causes of [the plaintiff's] ovarian cancer. This was adequate." (*Id.* at p. 329.) The court further stated the expert's conclusion that there was a known cause rather than an unknown etiology was supported by the factors she discussed, and "[t]he credibility of her explanation was for the jury to determine." (*Id.* at p. 330.)

Similarly, in this matter Dr. Reynard identified other possible causes apart from contaminated instruments and explained why he believed they were not the cause of Siemon's TASS. Specifically, he eliminated alternative causes because such potential contaminants were no longer in general use at the time of Siemon's surgery. While somewhat sparse, this record provides " ' "a reasoned explanation illuminating why the facts have convinced the expert, and therefore should convince the jury, that it [contamination from

10

surgical instruments] is *more probable than not*" ' " the cause of Siemon's TASS. (See *Pilliod v. Monsanto Co.*, *supra*, 67 Cal.App.5th at p. 623.) Accordingly, the Regents then must "prove 'the existence of an alternative explanation, supported by substantial evidence and not mere speculation,' to defeat the plaintiffs' explanation as a matter of law." (See *ibid*.) They have not done so. Instead, the Regents posit that fluids and antibiotics could still contain preservatives and sulfates because, for example, there may be a benefit to such ingredients that outweighs the risk of TASS. But they do not identify whether such a benefit exists, whether generally the medical community still uses fluids and antibiotics with preservatives and sulfates, or whether the Regents use such products. Accordingly, the court erred in barring Dr. Reynard from testifying that (1) Siemon sustained TASS as a result of the surgery, and (2) Siemon's TASS was caused by a contaminant on an instrument used during her surgery.[4]

However, the court did not err in prohibiting Dr. Reynard from testifying that a "failure to properly clean or adequately sterilize" the instruments used during surgery caused Siemon's TASS. The record does not support the logical leap that use of a contaminated instrument necessarily means there was a "failure" to properly clean or sterilize the instruments. This issue raises various questions, such as (1) what procedures constitute proper cleaning or sterilization, (2) did the Regents have such procedures in place, (3) did the Regents comply with those procedures, and (4) is there any instance in which contaminants could remain after following such procedures. As to the last question, Dr. Reynard acknowledged "even if an

---

[4] It is unclear whether the court's ruling in fact prohibited Siemon from raising this second point. However, we are including it here for purposes of clarity.

11

instrument is 100 percent sterilized there could be residual dead bacteria whose wall has an endotoxin that can precipitate TASS." The record also demonstrates Dr. Reynard was not offering an opinion as to the adequacy of the procedures for sterilizing instruments or the adequacy of any specific act of sterilization. He further testified his expertise is not within the field of sterilization or cleaning. While his differential etiology analysis could be interpreted as identifying the instruments as the most likely source of contamination, Dr. Reynard has not provided any basis for testifying that the Regents failed to properly clean or sterilize the instruments used in Siemon's surgery.

### 2. *Res Ipsa Loquitur*

Siemon asserts the court failed to properly consider her res ipsa loquitur theory when excluding Dr. Reynard's testimony. " 'Res ipsa loquitur is a rule of evidence allowing an inference of negligence from proven facts. [Citations.] It is based on a theory of "probability" where there is no direct evidence of defendant's conduct, [citations], permitting a common sense inference of negligence from the happening of the accident. [Citations.] The rule thus assists plaintiffs in negligence cases in regard to the production of evidence. [¶] The applicability of the doctrine depends on whether it can be said the accident was probably the result of negligence by someone and defendant was probably the person who was responsible. [Citations.] In the absence of such probabilities, there is no basis for an inference of negligence serving to take the place of evidence of some specific negligent act or omission. [Citation.] [¶] A plaintiff must produce the following evidence in order to receive the benefit of the doctrine: 1) the accident must be of a kind which ordinarily does not occur in the absence of someone's negligence; 2) it must have been caused by an agency or instrumentality within the exclusive

12

control of the defendant; and 3) the accident must not have been due to any voluntary action or contribution on the part of the plaintiff.' " (*Scott v. Rayhrer* (2010) 185 Cal.App.4th 1535, 1540.)

Siemon first claims the trial court erroneously believed she was required to prove a specific act of negligence and she "did not seek to elicit from Dr. Reynard an opinion that a specific act of the Regents fell below the standard of care." While Siemon is correct that res ipsa loquitor does not require proof of a specific act of negligence, she does need to prove the accident "probably was the result of negligence." (See *ibid.*) To this end, Dr. Reynard's report and testimony sought to assert in part that the Regents failed to properly sterilize and/or clean the instruments used in Siemon's surgery. But, as discussed in part II.B.1., *ante*, it was appropriate for the trial court to reject this portion of his testimony because he had no basis upon which to reach such an opinion.

Second, Siemon argues Dr. Reynard was qualified to give a general opinion regarding the use of sterile instruments in ophthalmic surgery. However, the trial court did not exclude Dr. Reynard's testimony on this point. To the contrary, the trial court noted, "I don't think anyone would dispute that in a general sense the failure to properly clean or adequately sterilize would constitute a breach." The trial court only excluded Dr. Reynard's opinion that *the Regents* engaged in a specific act of negligence— i.e., they failed to properly clean or sterilize the instruments used in Siemon's surgery.

Finally, Siemon appears to argue Dr. Reynard should be allowed to testify as to the Regent's negligence merely because she raises a res ipsa loquitor theory. However, the question before us is whether Dr. Reynard's testimony satisfies the requirements for expert testimony. Any legal

13

argument under res ipsa loquitor does not impact our analysis of the appropriate scope of Dr. Reynard's testimony as supported by the record.

## C. Nonsuit

Siemon asserts the trial court's order limiting Dr. Reynard's testimony precluded her from offering evidence to satisfy the elements of res ipsa loquitor and resulted in the court improperly granting the Regents' motion for nonsuit.

A motion for nonsuit "concedes the truth of the facts proved but denies as a matter of law that they sustain the plaintiff's case. A trial court may grant a nonsuit only when, disregarding conflicting evidence, viewing the record in the light most favorable to the plaintiff and indulging in every legitimate inference which may be drawn from the evidence, it determines there is *no* substantial evidence to support a judgment in the plaintiff's favor." (*Edwards v. Centex Real Estate Corp.* (1997) 53 Cal.App.4th 15, 27–28 (*Edwards*).) Our review is de novo. (*Baker v. American Horticulture Supply, Inc.* (2010) 185 Cal.App.4th 1295, 1308.)

"The elements of a cause of action for medical malpractice are: (1) a duty to use such skill, prudence, and diligence as other members of the profession commonly possess and exercise; (2) a breach of the duty; (3) a proximate causal connection between the negligent conduct and the injury; and (4) resulting loss or damage." (*Johnson v. Superior Court* (2006) 143 Cal.App.4th 297, 305.) As discussed above, the doctrine of res ipsa loquitur applies when three conditions are met: " ' "(1) the event must be of a kind which ordinarily does not occur in the absence of someone's negligence; (2) it must be caused by an agency or instrumentality within the exclusive control of the defendant; [and] (3) it must not have been due to any voluntary

14

action or contribution on the part of the plaintiff." ' " (*North American Title Co., Inc. v. Gugasyan* (2021) 73 Cal.App.5th 380, 394.)

It appears Siemon acknowledges she can only demonstrate negligence by way of a res ipsa loquitor theory, and she argues the trial court's order prevented her from offering evidence to support the first and second elements of res ipsa loquitor. Specifically, Siemon asserts she was unable to argue the first element because the court excluded Dr. Reynard from testifying that (1) TASS constitutes a "never event,"[5] and (2) the use of inadequately sterilized instruments in surgery is a breach of the standard of care. Siemon next contends she was unable to offer evidence to establish the causal component of the second element of res ipsa loquitor because Dr. Reynard was excluded from stating an unsterile instrument more likely than not caused her TASS.

We question whether the trial court's order as to the scope of Dr. Reynard's testimony actually precluded Siemon from offering such evidence.[6] However, based on our conclusions and clarifications as to the permissible scope of Dr. Reynard's testimony, it is appropriate to reverse the order granting nonsuit. Accordingly, we conclude Dr. Reynard may testify that (1) TASS is a "never event"; (2) Siemon sustained TASS as a result of the surgery; (3) Siemon's TASS was likely caused by a contaminant on an

---

[5] "Never event" is a term used in medicine to describe "adverse situations that should never happen."

[6] The trial court identified two statements in Dr. Reynard's report to which he could not testify: (1) Siemon "sustained TASS as a result of the surgery," and (2) the Regents' "failure to properly clean or adequately sterilize instruments deployed in [Siemon's surgery] was responsible for the development of TASS in [Siemon]." However, the court then appeared to grant both motions in limine in their entirety, which arguably sought to preclude a broader set of materials.

instrument used during that surgery; and (4) as a general matter, the use of inadequately sterilized instruments in surgery is a breach of the standard of care. Dr. Reynard may not testify that the Regent's failed to properly clean or adequately sterilize the instruments used in Siemon's surgery.

In the context of a motion for nonsuit—which requires the court to "view[ ] the record in the light most favorable to the plaintiff and indulg[e] in every legitimate inference which may be drawn from the evidence" (see *Edwards*, *supra*, 53 Cal.App.4th at pp. 27–28)—such evidence would be sufficient to support a judgment in Siemon's favor. We thus vacate the judgment and remand for further proceedings.

## III.
## DISPOSITION

We reverse the order granting nonsuit. We also reverse in part the order granting the Regents' motions in limine Nos. 10 and 15 as set forth in this opinion. We therefore vacate the judgment and remand for a new trial. Siemon may recover her costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1), (2).)

16

_____
Margulies, J.

WE CONCUR:

_____
Humes, P. J.

_____
Banke, J.

A160654

17