Filed 1/17/23  P. v. Brian Q. CA2/6

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>BRIAN Q.,<br><br>    Defendant and Appellant. | 2d Crim. No. B312389<br>(Super. Ct. No. 2017027756)<br>(Ventura County) |

Brian Q. appeals his conviction, by jury, of sodomy on a child 10 years old or younger (Pen. Code, § 288.7, subd. (a))[1] and oral copulation with a child 10 years old or younger.  (§ 288.7, subd. (b).)  The trial court sentenced him to a total term of 40 years to life in state prison, plus $3270 in fees and assessments.  (§§ 290.3, 1465.8; Gov. Code, § 70373.)  Appellant contends the trial court erred when it admitted the testimony of an expert witness regarding child sexual abuse accommodation syndrome

---

[1] All statutory references are to the Penal Code unless otherwise stated.

(CSAAS), when it excluded a statement made by the victim to the public defender's investigator recanting the abuse allegations, and when it failed to instruct the jury that it must unanimously agree on the specific act constituting each offense. Appellant further contends the cumulative impact of these errors requires reversal and that he was erroneously denied conduct credits. We order the abstract of judgment modified to award conduct credits and, in all other respects, affirm.

*Facts*

The Initial Report. Appellant is 15 years older than his sibling, O.Q.[2] When O.Q. was five or six years old, appellant had his own bedroom in the family home. O.Q. reported that appellant would lure O.Q. into his bedroom, ostensibly to play video games. Appellant would then make O.Q. perform oral sex and would have anal sex with O.Q. According to O.Q., this happened once or twice a week for several months, until appellant joined the Army and moved out of the family home. O.Q. remembered appellant coming back to the home about three times after he joined the Army. Appellant forced O.Q. to perform oral sex and anal sex on those occasions. Appellant did not perform other sex acts on O.Q.

O.Q. reported the abuse to his parents in July 2017. They took him to the police station the next day. O.Q. made an audio-recorded statement to Simi Valley Police Officer Steven Latham.

---

[2] Appellant and O.Q. have the same father but different mothers. O.Q. was assigned female at birth. After the events at issue here, O.Q. transitioned, adopted the name O.Q. and now uses male (he/him) pronouns. During trial, the trial court and counsel used the name O.Q. and male pronouns when referring to the victim. We will continue that practice in this opinion.

Two days later, O.Q. gave a video statement to Det. Jeffrey Quartararo. In his statement to Det. Quartararo, O.Q. said he did not remember the first time appellant abused him nor could O.Q. describe any specific incident with appellant. The abuse always involved the same acts, according to O.Q. Appellant would tell O.Q. to go into appellant's bedroom to play video games. Then, appellant would lock the door, make O.Q. perform oral sex and then hold O.Q. down while appellant sodomized him. O.Q. remembered one occasion on which his mother interrupted the abuse by knocking on appellant's locked bedroom door, to tell O.Q. it was time to go to swimming lessons.

The Pretext Call. With assistance from Det. Quartararo, O.Q. made a pretext call to appellant. During the call, O.Q. asked appellant, "So remember when I was like five and you lured me into your room and you'd make me suck your dick and do anal sex?" Appellant replied, "Yeah." O.Q. asked why appellant abused him, and appellant replied, "I honestly can't really answer that and I, you know, am gonna continue to regret it for the rest of my life." Appellant agreed when O.Q. said the abuse happened "once or twice a week for like months" and continued when appellant was on leave from the military.

Appellant's Statement to Police. Appellant was arrested about four hours after the pretext call. He agreed to answer Det. Quartararo's questions and the interrogation was recorded on video. Det. Quartararo told appellant that O.Q. had reported that appellant would make him perform oral and anal sex. Appellant replied, "That's true." He also agreed that the abuse occurred once or twice a week for four to six months and continued when he came home on leave from the Army.

As the interrogation was ending, Det. Quartararo offered to relay an apology to O.Q. Appellant said he wanted O.Q. to know, "I'm really sorry. I never should have . . . done those things to you. I never should have forced that upon you." Appellant said he was "not a perfect person" and that he was "very truly sorry."

When the interrogation concluded, Det. Quartararo assisted appellant in calling his father, Cesar. During the conversation, appellant said he abused O.Q. because he was "in distress" and depressed. He described himself as "not a perfect person" and "messed up in the head." Appellant also called his estranged wife. In that conversation, he once again admitted that he sexually abused O.Q.

Cesar testified that O.Q.'s report of abuse and appellant's arrest had affected the entire family. Cesar was determined to protect O.Q. but was also very angry and sad. His relationship with O.Q.'s mother Teresa was "very rough." In April 2019, almost two years after O.Q. disclosed the abuse, Cesar was depressed and had a panic attack that required his hospitalization.

O.Q. Recants. In September 2019, about six months after Cesar's panic attack and two years after appellant's arrest, O.Q. told Cesar that nothing happened between him and appellant, that he was sorry and he did not know how they could "fix these things." O.Q. explained that he made the accusations because he wanted to keep Cesar and Teresa together and knew Cesar would support him.

In December 2019, Cesar contacted the public defender's office about O.Q. having recanted. An investigator from the public defender's office came to the family home to interview O.Q.

4

in February 2020. The interview was tape recorded, but not introduced into evidence at trial.

At trial, O.Q. denied that appellant had ever abused him. O.Q. denied being locked in appellant's room, held down on the bed, or raped by appellant. Instead, O.Q. testified, his relationship with appellant was "normal," and they were playing video games in his bedroom with the door open. O.Q. also denied that either he or appellant were ever naked in the room.

O.Q. testified that the statements he made to his parents and to the police were false. He explained he had several reasons for falsely reporting that appellant abused him. O.Q. was jealous of appellant's relationship with their father. Before he reported the abuse, O.Q. learned that appellant and his wife were mistreating a dog they owned. O.Q. was also suffering from depression and had been cutting himself. When O.Q. first complained of depression, his parents took him to church although they later arranged for him to get therapy. After he reported the abuse, O.Q. got medication and additional therapy. He believed the family got closer and that his parents started trying harder to get along.

O.Q. testified that he was confused during the pretext call when appellant said that he regretted forcing O.Q. to engage in oral and anal sex. O.Q. maintained that he had never seen appellant's penis and had never engaged in oral or anal sex with him.

Expert CSAAS Testimony. Forensic psychologist Dr. Jody Ward testified as an expert witness on child sexual abuse accommodation syndrome (CSAAS). CSAAS is a pattern of behavior exhibited by many, but not all, people who have been sexually abused. The syndrome is non-diagnostic and is used to

help adults understand why children do what they do in response to sexual abuse. Many of those behaviors may seem counterintuitive. While CSAAS describes common behaviors, it cannot be used to determine the cause of those behaviors. Dr. Ward explained that the syndrome "is not a diagnostic tool, meaning that it cannot be used to prove or disprove whether sexual abuse occurred." The same behaviors could be caused by other factors including dysfunctional family situations like substance abuse.

Dr. Ward stated that she testifies "blind," meaning that she does not meet the alleged victim, read any police reports or learn any facts concerning the case. "I come in [to court] to talk about how child victims respond as a class. Not about any particular child."

CSAAS consists of five categories of behaviors: 1. secrecy; 2. helplessness; 3. entrapment and accommodation; 4. delayed, unconvincing disclosure; and 5. recantation or retraction. Dr. Ward opined that it is common for children who have been sexually abused to keep their abuse secret and to delay reporting or disclosing the abuse for many years. "The research [h]as shown that two-thirds of the people who have been sexually abused with an ongoing relationship by somebody they know well, two-thirds of those people will wait until adulthood to report the abuse. . . . [¶] And when a child or an adult makes a disclosure of sexual abuse, that person may not come out with everything that occurred in the sexually abusive situation all at once."

With regard to recanting, Dr. Ward explained that disclosing sexual abuse is often very disruptive for a child. In addition to intrusive interviews and physical exams, the child's

6

family life may be severely disrupted. The child victim may see recanting as a way to put everything back the way it was before their disclosure. Dr. Ward opined, "[I]t's important to remember whenever anybody is reporting . . . child sexual abuse, the point is just to get the abuse to stop. The point is not to come into court and testify and put somebody in jail and all the other stuff down the road. That really doesn't enter into a person's mind. [¶] And so once these things start happening, a child may wish that they have never made the disclosure and recant that disclosure, take it back or just back-pedal and say, oh, it wasn't that bad or I don't remember and I don't recall."

Dr. Ward agreed that a "substantial minority" of children who have "outwardly supportive famil[ies]" recant their reports of sexual abuse. "The research shows that about – I call it a substantial minority. The actual number is 22 – 22 percent in one study of children who were abused by someone in their home. Those children are more likely to recant sexual abuse than children who are molested outside of their home or not by a family member. And the thinking is – again, this is the idea that children want to keep their family together and they feel a lot of loyalty and love toward that parent and don't want to see someone so close to them suffer the consequences of reported sexual abuse."

On cross examination, Dr. Ward explained that the study to which she referred was conducted within the last 10 years in Los Angeles County and involved more than 100 subjects. It found that 22 percent of the children studied recanted their reports of sexual abuse. "The factor that was determinative of their recantation was the abuse occurred in their immediate family."

7

Dr. Ward acknowledged that there are children who make false reports of sexual abuse. No syndromes or checklists exist that can determine whether a child has been abused, or whether they are lying. One "dynamic in the family" that is associated with false reporting "is a report that occurs within a divorce or custody type of situation. In those types of situations, the rate of false reporting is pretty high. It can be one-third to 50 percent depending on the situation."

<u>Appellant's Testimony</u>. Appellant testified that as a child he was physically abused by his father. The abuse ended when appellant's parents divorced. When appellant was 16 years old, he confronted Cesar about the abuse. Cesar began to pay more positive attention to appellant after that conversation.

In 2015, appellant came out as transgender.[3] He began receiving Estradiol shots and taking testosterone blocking pills in May 2017. One side effect of the medication was that appellant experienced mood swings, crying spells and periods of self-harming.

Appellant testified that he was shocked by O.Q.'s statements during the pretext call. At the time, appellant was aware that O.Q. had been self-harming and was hospitalized for mental health treatment. Appellant agreed with O.Q.'s statements about oral and anal sex to be supportive and to stop O.Q. from harming himself again. When he told O.Q. that he would always regret what he had done, appellant was "mentally and emotionally" remembering what he was going through before he transitioned.

---

[3] We refer to appellant using male pronouns (he/him) because those pronouns were used by the trial court and counsel.

Appellant also explained that the statement he made to Det. Quartararo was not true. When he apologized for what he had done to O.Q., he was referring to the fact that he "wasn't there for [O.Q.]." Appellant told Quartararo that O.Q.'s accusations were correct because, "I felt like I needed to protect [O.Q.]" and because he "had a lot of weight on my shoulders that I was going through with everything that I have been through, so I just couldn't . . . I couldn't handle the situation properly. I couldn't really say what I really wanted to say and I just – it almost felt like I was just on – running on mixed emotions."

At the time of the pretext call, appellant testified, he was aware that O.Q. was having mental health struggles and had been hospitalized. He thought O.Q. might be suicidal, so he wanted to agree with his statements. After the call was over, appellant did not call their father or O.Q.'s mother, to talk about O.Q.'s mental health. He took no additional steps to help O.Q.

Appellant believed that the medications he was taking to assist his transition to female might have had an impact on his own feelings of depression and anxiety. He did not, however, tell Det. Quartararo about those medications. When appellant told Det. Quartararo that he would be "forever remorseful about what had happened," he was referring to "[e]verything that happened to me in my life," and also the failure of his marriage.

After the interrogation was over, Det. Quartararo helped appellant call Cesar. During that telephone call, appellant admitted he had sexually assaulted O.Q. He explained that he falsely admitted to the sex offenses because he "wanted to hear his reaction if he had actually thought of me any less 'cause of my type of relationship when I was younger with him." Appellant then had a telephone call with his estranged wife in which he

9

also admitted to having committed sex offenses against O.Q. He made this false statement to his wife because, "psychologically, I wasn't in my right mind to begin with."

The Judgment. The jury convicted appellant of one count of sodomy with a child 10 years of age or younger (§ 288.7, subd. (a)) and one count of oral copulation with a child 10 years of age or younger. (§ 288.7, subd. (b).) The prosecution dismissed one count of continuous sexual abuse. (§ 288.5, subd. (a).)

## Contentions

Appellant contends Dr. Ward's testimony was irrelevant and inflammatory because she offered an improper opinion on his guilt. He contends the trial court erred when it instructed the jury in terms of CALCRIM No. 1193 because the instruction allowed the jury to use Dr. Ward's CSAAS testimony as evidence of appellant's guilt and because the instruction reduced the prosecution's burden of proof. Appellant further contends the trial court erred when it excluded O.Q.'s statement recanting his abuse allegations. He contends the statement was admissible as a prior consistent statement (Evid. Code, §§ 791, 1236) and that its exclusion violated Evidence Code section 356. Appellant contends the trial court erred when it failed to instruct the jury that they must unanimously agree on the act constituting each charged offense. Finally, appellant contends cumulative error requires reversal and that he was erroneously denied all conduct credits. We direct the abstract of judgment modified to award conduct credits and, in all other respects, affirm.

## Discussion

CSAAS Testimony. "Trial courts may admit CSAAS evidence to disabuse jurors of five commonly held 'myths' or misconceptions about child sexual abuse. [Citation.] While

CSAAS evidence is not relevant to prove the alleged sexual abuse occurred, it is well established in California law that CSAAS evidence is relevant for the limited purpose of evaluating the credibility of an alleged child victim of sexual abuse." (*People v. Lapenias* (2021) 67 Cal.App.5th 162, 171 (*Lapenias*).) CSAAS evidence may not be used "as a *predictor* of child abuse." (*People v. Bowker* (1988) 203 Cal.App.3d 385, 393.) Nor may the components of the syndrome be described in a way that allows "'the jury to apply the syndrome to the facts of the case and conclude the child was sexually abused.'" (*People v. Julian* (2019) 34 Cal.App.5th 878, 885, quoting *Bowker, supra,* at p. 393.) It is improper for an expert witness to offer an opinion on the statistical probability of the defendant's guilt or the likelihood that a complaining witness' testimony is truthful. (*Lapenias, supra,* at p. 176; *People v. Wilson* (2019) 33 Cal.App.5th 559, 571.)

Appellant contends Dr. Ward ran afoul of these principles when she testified that one study found 22 percent of children who disclose sexual abuse by a person who lives in their home later recant that claim. We disagree. Dr. Ward cited the statistic, but was also careful to explain that CSAAS cannot be used to determine whether a child has, in fact, been abused. CSAAS is instead a non-diagnostic description of a pattern of behaviors that is common among children who have been sexually abused. The behaviors described by the syndrome could also be caused by other factors, including other types of dysfunctional family situations. Dr. Ward acknowledged children respond "to sexual abuse in as many different ways as there are children." While recanting a report of abuse is one component of the syndrome, "recantation disclosure, late disclosure [cannot] be used to determine whether or not sexual abuse occurred." Dr.

11

Ward insisted, "None of this stuff is diagnostic," and that there is no "psychological way to determine whether or not someone is telling the truth" when they report abuse or retract a report.

Dr. Ward cited the statistic regarding recanting to illustrate the point that recanting is one behavior demonstrated by children who report sexual abuse. Nothing in her testimony suggested the statistic could be used to determine whether any specific report of sexual abuse was true or false. The trial court did not err in admitting the testimony.

Appellant contends, without evidentiary support, that CSAAS testimony has become irrelevant because the misconceptions addressed by the syndrome are no longer widely accepted by the general public. First, the contention has been forfeited because appellant did not raise it in the trial court. (*People v. Morales* (2020) 10 Cal.5th 76, 98.) Had the contention been preserved we would reject it because the record does not affirmatively demonstrate the trial court abused its discretion in admitting the testimony. (*Christ v. Schwartz* (2016) 2 Cal.App.5th 440, 446-447; *Burton v. Sanner* (2012) 207 Cal.App.4th 12, 22-23.) The record contains no support for appellant's claim that the elements of CSAAS testimony are so well known by the general public as to make expert testimony on the subject unnecessary.

Instructional Error. Consistent with CALCRIM No. 1193, the trial court instructed the jury that Dr. Ward's "testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against him or any conduct or crimes of which he was not charged. [¶] You may consider this evidence only in deciding whether or not [O.Q.'s] conduct was not inconsistent with the

conduct of someone who has been molested, and in evaluating the believability of his testimony." Appellant contends the trial court erred because the instruction allows the jury to consider CSAAS evidence in evaluating the believability of O.Q.'s testimony.

We rejected this contention in *People v. Gonzales* (2017) 16 Cal.App.5th 494, a case involving CSAAS testimony also given by Dr. Ward. There, we concluded that, "A reasonable juror would understand CALCRIM No. 1193 to mean that the jury can use [Dr.] Ward's testimony to conclude that [the complaining witness'] behavior does not mean she lied when she said she was abused. The jury also would understand it cannot use Ward's testimony to conclude [the complaining witness] was, in fact, molested. The CSAAS evidence simply neutralizes the victim's apparently self-impeaching behavior. Thus, under CALCRIM No. 1193, a juror who believes Ward's testimony will find both that [the complaining witness'] apparently self-impeaching behavior does not affect her believability one way or the other, and that the CSAAS evidence does not show she had been molested. There is no conflict in the instruction." (*Id.* at p. 504.) We further concluded, "CALCRIM No. 1193 was proper and did not violate due process." (*Ibid.*; see also, *Lapenias, supra,* 67 Cal.App.5th at p. 175 [agreeing with *Gonzales* that, "the instruction does not: (a) improperly allow an alleged minor victim of sexual abuse to corroborate her own testimony; (b) violate due process; or (c) misapply the burden of proof"].)

The same reasoning applies here. A reasonable juror would understand CALCRIM No. 1193 to mean that O.Q.'s behavior, for example, his delayed disclosure and his retraction of the initial report of abuse, does not mean his initial report was a lie, nor

does it mean that he was, in fact, abused. The trial court did not err in instructing the jury in terms of CALCRIM No. 1193.

O.Q.'s Statement to Defense Investigator. O.Q. gave his original statement to police in July 2017. O.Q. recanted this report to his father, Cesar, in September 2019. About five months later, in February 2020, O.Q. gave a recorded statement to an investigator from the public defender's office in which he also recanted his original statement, maintaining that it was untrue and that he had never been abused by appellant. O.Q.'s trial testimony was consistent with his statement to the investigator. The trial court excluded the audio recording of that statement as hearsay.

Appellant contends the trial court erred because the recording was admissible as a prior consistent statement under Evidence Code sections 1236 and 791. He contends the audio recording was also admissible to provide the jury with his complete statement, after the prosecution used portions of it to imply that his retraction was untrue. (Evid. Code, § 356.) Appellant further contends excluding the statement was federal constitutional error because it impaired his right to present a complete defense.

Evidence Code section 1236 provides that evidence of a witness' prior statement "is not made inadmissible by the hearsay rule if the statement is consistent with his testimony at the hearing and is offered in compliance with Section 791." (*Ibid*.) Section 791 provides that evidence of a prior consistent statement is inadmissible to support a witness' credibility unless "it is offered after: (a) Evidence of a statement made by him that is inconsistent with any part of his testimony at the hearing has been admitted for the purpose of attacking his credibility, and the

14

statement was made before the alleged inconsistent statement; or (b) An express or implied charge has been made that his testimony at the hearing is recently fabricated or is influenced by bias or other improper motive, and the statement was made before the bias, motive for fabrication or other improper motive is alleged to have arisen."  (*Id*., subds. (a), (b).)

As our Supreme Court explained in *People v. Dalton* (2019) 7 Cal.5th 166, 234, "Evidence Code section 791 does not require a witness to be free from all possible bias at the time of her prior consistent statement.  Rather, 'a prior consistent statement is admissible if it was made before the existence of any one or more of the biases or motives that, according to the opposing party's express or implied charge, may have influenced the witness's testimony.'  [Citations.]"  We review the trial court's decision to exclude the statement for abuse of discretion and find none. (*People v. Waidla* (2000) 22 Cal.4th 690, 725.)

Appellant contends the entire recorded statement should have been admitted as a prior consistent statement because O.Q. gave the statement to the investigator before his motive to fabricate arose.  But the record does not support that contention. O.Q. and Cesar testified that their family life became very difficult after O.Q. disclosed the abuse.  Cesar's marriage to O.Q.'s mother suffered and he experienced a lot of sadness and stress.  In April 2019, Cesar had a panic attack that required his hospitalization.  O.Q. recanted to Cesar in September 2019. Cesar testified that O.Q. seemed happier after he recanted.  The rest of the family was also relieved and happier.

"A prior consistent statement logically bolsters a witness's credibility whenever it predates *any* motive to lie, not just when it predates all possible motives."  (*People v. Hillhouse* (2002) 27

15

Cal.4th 469, 492.) Here, however, there is no evidence of a motive to lie that arose after O.Q. retracted his initial report of abuse. If, as respondent suggests, O.Q. could have been motived to lie by a desire to spare his family the stress, emotional upheaval and embarrassment of a trial, that motive predated his retraction. There is no evidence showing that a new or different motive arose between the time O.Q. gave his statement to the investigator and the time he testified at trial. Under these circumstances, the trial court did not abuse its discretion when it excluded the recorded statement.

Appellant contends the entire recording was admissible under Evidence Code section 356, because the prosecutor used portions of the recorded statement to impeach O.Q's testimony at trial. Evidence Code section 356 "provides that if part of an act, conversation, declaration, or writing is placed in evidence, the adverse party may inquire into 'the whole *on the same subject.*' (Italics added.) The purpose of this section is to prevent the use of selected aspects of a conversation, act, declaration, or writing, so as to create a misleading impression on the subjects addressed. [Citation.] Thus, if a party's oral admissions have been introduced in evidence, he may show other portions of the same interview or conversation, even if they are self-serving, which 'have some bearing upon, or connection with, the admission . . . in evidence.' [Citations.]" (*People v. Arias* (1996) 13 Cal.4th 92, 156.)

Appellant did not raise Evidence Code section 356 as a basis for admitting the full recorded statement. The contention that it was admissible on that basis has, therefore, been forfeited. (*People v. Smith* (2003) 30 Cal.4th 581, 629-630.) Had the contention not been forfeited, we would reject it because any

16

error in excluding the recording was harmless. (*People v. Boyette* (2002) 29 Cal.4th 381, 427-428.)

First, O.Q. was questioned extensively, by both parties, on the content of his retraction. The jury learned the substance of O.Q.'s retraction and many of the details he provided in the statement, even though it did not have the audio recording or transcript. Second, Cesar corroborated O.Q.'s trial testimony and was questioned by both parties about the September 2019 conversation in which O.Q. first recanted. The recording and transcript of O.Q.'s February 2020 statement would have been duplicative of this testimony.

Finally, any error in excluding the recording and transcript was harmless because the evidence of appellant's guilt was overwhelming. Appellant unequivocally admitted that he forced O.Q. to perform oral and anal sex in the pretext call with O.Q., in his recorded interrogation with Det. Quartararo and in subsequent conversations with Cesar and with his wife. It is not reasonably probable that the jury would have rejected appellant's own words because it heard a recording of O.Q.'s retraction rather than his testimony on the same subject.

For the same reasons, we reject appellant's contention that excluding the recording deprived him of the ability to present a complete defense. (See, e.g., *Michigan v. Lucas* (1991) 500 U.S. 145, 149; *Crane v. Kentucky* (1986) 476 U.S. 683, 690.) Appellant contends the recorded statement would have raised reasonable doubt on the truthfulness of O.Q.'s initial report of abuse. But the jury heard the substance of O.Q.'s statement to the defense investigator, Cesar's corroboration of it and O.Q.'s trial testimony maintaining that no abuse occurred. It also heard appellant's trial testimony in which he offered implausible and varying

explanations for his confession's. Appellant's ability to present a defense was not impeded by exclusion of the recorded statement.

Unanimity Instruction. Appellant contends the trial court prejudicially erred by failing to instruct the jury that it had to unanimously agree on the specific act that constituted each offense. We conclude there was no error because appellant offered the same defense to each alleged sexual assault and offered the jury no reasonable basis for distinguishing among them. (*People v. Covarrubias* (2016) 1 Cal.5th 838, 880 (*Covarrubias*).)

A jury verdict in a criminal case must be unanimous. (*People v. Russo* (2001) 25 Cal.4th 1124, 1132.) "[W]hen the evidence suggests more than one discrete crime, either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act." (*Ibid*.) Where the evidence indicates that jurors might disagree as to the specific act committed by the defendant, a unanimity instruction must be given. "But when there is no reasonable likelihood of juror disagreement as to particular acts, and the only question is whether or not the defendant in fact committed all of them, the jury should be given a modified unanimity instruction which, in addition to allowing a conviction if the jurors unanimously agree on specific acts, also allows a conviction if the jury unanimously agrees the defendant committed all the acts described by the victim." (*People v. Jones* (1990) 51 Cal.3d 294, 322; see also *People v. Davis* (2005) 36 Cal.4th 510, 562 (*Davis*) [unanimity instruction not required where defendant offered same to defense to multiple charges "so no juror could have believed defendant committed one act but disbelieved that he committed the other"].)

In his interview with Det. Quartararo, O.Q. described the sexual assaults in general terms.  He said that the assaults occurred once or twice a week over about six months, in appellant's bedroom at the family home.  The assaults involved only oral and anal sex.  O.Q. could not remember the first assault, or any other specific assault, nor could he describe any details that would distinguish one assault from another.  O.Q.'s recantation was similarly general:  he testified that no assaults occurred.  Appellant offered the same blanket denial.  He testified that he never had any sexual contact with O.Q.  This left the jury with a stark choice.  It either believed O.Q.'s original statement and found that appellant had oral sex and anal sex with O.Q. on at least one occasion, or it believed the recantation and found no such activity took place.  The evidence supplied no reasonable basis for distinguishing one sexual assault from another.  Under these circumstances, a unanimity instruction was not required. (*Covarrubias, supra,* 1 Cal.5th at pp. 870-880; *Davis, supra*, 36 Cal.4th at p. 562.)

Cumulative Error.  Appellant contends the cumulative effect of the trial court's errors requires reversal.  Because we have no prejudicial error, there is no error to accumulate.  (*People v. Myles* (2012) 53 Cal.4th 1181, 1225.)

Conduct Credits.  Appellant contends the trial court erroneously declined to award him conduct credits for the time he spent in custody prior to sentencing.  He is correct.  A defendant sentenced to state prison is entitled to both custody credit for the actual period of confinement prior to sentencing, and conduct credit for good behavior during the period of confinement prior to commencement of sentence.  (§ 4019; *People v. Brewer* (2011) 192 Cal.App.4th 457, 461.)  Section 2933.1, subdivision (c) provides

19

that conduct credits "shall not exceed 15 percent of the actual period of confinement" prior to sentencing where a person is convicted of a felony punishable by life in prison. Appellant is entitled to conduct credits as provided in section 2933.1. We remand the matter to award the proper conduct credits and amend the abstract of judgment accordingly.

### *Disposition*

The matter is remanded with directions to the trial court to determine the custody credit to which appellant is entitled and to prepare and forward to the Department of corrections an amended abstract of judgment reflecting those credits. In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED.


YEGAN, J.

We concur:


GILBERT, P. J.


BALTODANO, J.

20

Ryan J. Wright, Judge

Superior Court County of Ventura

_____

Mark D. Lenenberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Steven D. Matthews, Supervising Deputy Attorney General, Analee J. Brodie, Deputy Attorney General, for Plaintiff and Respondent.